**WEATHER–RITE SPORTSWEAR CO., Inc., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**C.D. 3774; Protest Nos. 60/31343–93000, etc.**

United States Customs Court, First Division.

April 14, 1969.

Norman Katz, New York City, for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (by Andrew P. Vance and Bernard J. Babb, New York City), for defendant.

Before WATSON, MALETZ, and NEWMAN, Judges.

NEWMAN, Judge:

Plaintiff moves for summary judgment—an application of first impression in the United States Customs Court—bottomed upon a widely adopted procedural remedy which is not, however, explicitly authorized or spelled out by the rules of this Court. We feel constrained, with the utmost reluctance, to deny the motion.

Indeed, we state parenthetically at the outset, that a committee of this Court is contemporaneously engaged in an active study of the revision and updating of our Court Rules; and a study of the advisability of including the procedural remedy of summary judgment is under serious consideration by the committee for submission to the Court. In this connection, we desire to emphasize that the Customs Court is in the position of a national federal court having statutory authority to promulgate its own rules (28 U.S.C. § 2071).

*The Facts*

The moving papers, thoroughly documented, yet uncontradicted by any sworn

affidavits on the Government's part, show:

Plaintiff, an importer of various synthetic rubber articles, was responsible for the introduction to the American market of such synthetics imported from Japan. It appears that Leon Greenberg, plaintiff's president, travelled extensively in Japan, and made a thorough study of the Japanese manufacturers' method of production and the materials utilized. Thereupon, plaintiff determined that the use of synthetic rubber for rainwear and other related articles was feasible, and contracted with several Japanese manufacturers for the production with synthetic rubber of various articles, and their consequent importation to this country.

Subsequently thereto, many shipments of synthetic rubber articles were received by plaintiff from these manufacturers during the period of 1958 to 1963, inclusive, through a number of American ports: Seattle, Portland, Los Angeles, San Francisco, Houston, New Orleans and New York. In his moving affidavit, Mr. Greenberg states, from personal knowledge, that he observed the production methods, materials utilized, and examined the production records. Continuing, the affiant details and emphasizes that the merchandise manufactured on behalf of plaintiff and comprising the entries in question, were in chief value of synthetic rubber. Appended to the moving papers, are representative photocopies of sales notes, invoices and supporting data in full corroboration of plaintiff's contentions. The Court is satisfied, beyond peradventure of doubt, that the fifty entries through San Francisco (involved in this action) are in chief value of rubber, and precisely the same or virtually similar to the remainder of the importations made through the other designated ports.

Beginning with 1959, plaintiff duly filed protests at all ports, claiming that its synthetic rubber articles were properly dutiable at 8½% under paragraph 1558 of the Tariff Act (as amended and modified by the General Agreement on Tariffs and Trade) as synthetic rubber articles, rather than as liquidated by the various collectors at 12½% by similitude to articles in chief value of India rubber under paragraph 1559/1537(b) of the Tariff Act of 1930, as amended; or in some instances as liquidated directly under paragraph 1537(b) at 12½% as articles in chief value of India rubber.

In due course, a trial of this issue was held before the then Chief Judge Webster J. Oliver, who rendered a decision in favor of the importer (this plaintiff), determining that the rainwear in chief value of synthetic rubber was dutiable under paragraph 1558 at 8½%, as asserted by the importer. (Weather-Rite Sportswear Co., Inc. v. United States, 49 Cust.Ct. 180, Abs. 66910). That decision was restricted to some effect by the Bureau of Customs, and thereafter a second trial of the issue was conducted by Chief Judge Oliver, who again upheld the importer's claim. (Weather-Rite Sportswear Co., Inc. v. United States, 51 Cust. Ct. 221, Abs. 68019).

Upon the Government's appeal from this latter decision and judgment, the Court of Customs and Patent Appeals unanimously affirmed. (United States v. Weather-Rite Sportswear Co., Inc., 52 CCPA 7, C.A.D. 848).

Following the appellate court's holding, the plaintiff and the Government executed stipulations, affecting some five hundred protests, and concerning importations of merchandise, as plaintiff insists, "similar in all respects to the merchandise covered by the test cases." Those stipulations covering protests in the Ports of New York, Los Angeles, Seattle, Portland, Houston and New Orleans were approved by this Court, and judgments based on the stipulated cases were duly entered in favor of the plaintiff for each importation.

For some reason not definitively spelled out herein by defendant, the customs officials at the Port of San Francisco have refused to certify similar stipulations affecting the fifty protests herein involved by the same importer, despite several submissions. Plaintiff's moving papers,

buttressed by affidavits and documents, painstakingly and convincingly prove to this Court's complete satisfaction that the merchandise herein is precisely the same, or substantially similar to, the importations involved in the two test cases, the affirmance by our appellate court, and the many stipulations affecting hundreds of importations executed by plaintiff and the Government (in all the ports other than San Francisco), with subsequent specific approval in each instance by this Court as described hereinabove.

In short, the plaintiff's motion for summary judgment presents an unassailable and uncontradicted case on the facts —a devastating case, to be blunt. Nevertheless the defendant has, advisedly, submitted no opposing affidavit although this Court, unilaterally, offered to and did extend the Government's time to provide such an opportunity. Defendant has chosen, instead, to submit an answering memorandum and a surreply memorandum.

### Argument

Plaintiff contends:

1. The law and recognized public policy demand an end to protracted, expensive and unnecessary litigation; and that in light of the implicit and explicit authority of the United States Customs Court to promulgate its own rules, we should take judicial notice of the fact that the procedural remedy of summary judgment is found in the rules of virtually all courts of record throughout the country, and should be utilized in this case.

2. A main question before this Court is the interpretation of Rule 6(d) of the Rules of the Court, more particularly the clause contained therein: "all other motions", to determine whether that clause includes within its framework the authority for granting (in an appropriate situation) a motion for summary judgment.

3. In view of the arbitrary and capricious position of the Government in this context where, plainly there is no arguable defense, and in refusing to stipulate, thereby denying plaintiff an opportunity for a speedy disposition without the necessity of an expensive and lengthy trial, defendant has the burden of going forward.

4. The decisions and judgments in the dispositive holdings and stipulated cases are *stare decisis* of the issue herein.

Defendant contends:

1. The procedural remedy of summary judgment—not of common law origin and an extraordinary procedure which must be predicated on statute or court rule—is not authorized by any rule of the United States Customs Court (although admittedly, this Court has unique statutory authority to promulgate its own rules), and that the summary judgment procedure does not fall within the purview of Rule 6(d).

2. Summary judgment is not available to plaintiff inasmuch as there is a genuine issue of fact.

### The Law

Taking the Government's contentions in inverse order, this Court summarily strikes down the latter contention. Quite apart from the failure (advisedly or strategically) to submit any affidavit or exhibit in opposition, the defendant's effort to discuss some meagre "factual" opposition in its brief and surreply brief is patently inappropriate, inapplicable, and inadequate.

We have no hesitation whatever, in proceeding from the secure hypothesis that there is no justiciable question of fact before us. We view this novel application as presenting a sole question of law: can we grant summary judgment when this Court has no specific rule or case law authorizing that remedy?

Summary judgment, of course, is the widely applauded device which seeks to obviate the delay and expense incident to the enforcement of valid claims where denials are interposed which, even if sufficient in law on their face, are actually sham, and in reality raise no genuine triable issue of fact. It was designed to

discern between real issues deserving trial and feigned issues which merely delay the entry of judgment.[1]

## The English Courts

Paston's "Summary Judgment" outlines some interesting background in the evolution of this procedural device in England (pages 4–5):

Strangely enough, even prior to Columbus' discovery of America, "an English law book written [in 1470] for laymen, sought the cause for the 'huge delays' that 'withheld petitioners from their rights' and imposed 'an intolerable burden of expense'". (DeLaudibus Legum Anglis, c. LII, Fortescue). And in 1727, Jonathan Swift in Gulliver's Travels, said mockingly:

"In pleading they studiously avoid entering into the merits of the cause—after which they consult precedents, adjourn the cause from time to time, and in ten, twenty, or thirty years, come to an issue—so that it will take thirty years to decide whether the field left me by my ancestors for six generations belongs to me, or to a stranger, three hundred miles off."

Subsequently and after considerable agitation in England by laymen and legislators alike, finding delays and technicalities of common law intolerable, Keating's Act in 1855 devised a summary judgment procedure to facilitate the collection of bills of exchange. England, step by step, and particularly in 1873, amplified and liberalized this "prompt, business-like and inexpensive method of disposing of a substantial amount of litigation by this most effective method in the arsenal of judicial administration."[2]

In 1875, Lord Jessel as Master of the Rolls in the Court of Appeal said, in simple and classic language, that Order XIV (authorizing summary judgment) "is intended to prevent a man, clearly entitled to money, from being delayed where there is no fairly arguable defence";[3] and in 1912, Sir Frederick Pollock delightedly found: "We cannot doubt that Order XIV is among the most beneficent inventions of modern procedure".[4]

This Court has examined the statistics relating to the disposition of motions for summary judgment by the King's Bench Division. To obviate a tangential discussion, we simply state that the Enlish Courts have granted summary judgments in an amazingly high percentile, refusing to exalt form over substance.[5]

## Our State Courts

Chief Judge Leon R. Yankwich of the United States District Court, Southern District of California, observed that, although English civil procedure was bound for centuries by the rigor of common law rules and strict common law pleading, and "despite the traditional American reform spirit, some of the most fruitful recent innovations in the realm of civil procedure (such as summary

1. See the authorities collected in Clark and Samenow, The Summary Judgment, 38 Yale L.J. 423; Moore's 6 Federal Practice 2001; Barron and Holtzoff (Wright) 3 Federal Practice and Procedure 94; Yankwich, Summary Judgment Under Federal Practice, 40 Cal. L.R. 204; 8 Cycl. of Federal Procedure 203; Shientag, Summary Judgment; Paston, Summary Judgment in New York,

2. Shientag, Summary Judgment, 1.

3. Yankwich, *supra*, p. 205.

4. Pollock, The Genius of the Common Law, 83.

5. Cohen, Summary Judgments, 32 Columbia Law Review, 825, 830. The geneology

of summary procedure has been traced at least as far back as the *"Saepe contingit"* of Pope Clement V. For the history of summary procedure in canon and civil law, see Engelmann, History of Continental Civil Procedure 492, 578, 692, 743, 768, 809. The technique of summary procedure in the canon and civil law is quite different from that incorporated in the Anglo-American summary judgment procedure. But the purpose of Pope Clement to have cases tried "simply, on the level, without confusion or legal formalism", and the comment of Beaumanoir, "It is not good nor according to God that there be long pleas and great costs in little causes", have a universal appeal.

judgment) originated in the rule-making of English judges".[6]

New Jersey was the first state to adopt, in 1912, summary judgment procedure after sporadic agitation over decades.[7]

Unquestionably, the greatest impact among the states was accomplished by the adoption in New York (effective October 1, 1921) of Rule 113 of the Rules of Civil Practice, although originally circumscribed to certain specifically denominated causes of action. Yet, this strict limitation and narrow literalism did not deter a teacher and trial lawyer from describing this new adjunct of the law as "the outstanding achievement of the Civil Practice Revision of 1921".[8] From time to time, the base has been broadened to the point where presently summary judgment in New York has virtually no prescriptions. In 1937, the State Judicial Council hailed the remedy of summary judgment as "noteworthy for its marked contribution to the cause of speedy justice and the alleviation of the economic waste of unnecessary and protracted litigation" (Third Annual Report, page 30).[9] Professor Leonard Saxe, then Executive Secretary of the Judicial Council, stressed: "the efficiency of the motion is very high" and "markedly expedited the disposition of cases".[10]

Very recently, Rule 3212 (summary judgment) of the new Civil Practice Law and Rules, effective September 1, 1963, has added major subdivisions, patterned after the Federal Rule 56 (28 U.S.C.A.), concluding with the broad provision: "The Court may make any order as may aid in the disposition of the action."

Significantly, Circuit Court Judge Charles E. Clark, who when Dean of Yale Law School, served as Reporter to the Advisory Committee which drafted the Federal Rules of Practice, emphasized:

The great impetus for adoption of the procedure generally in this country seems to have come from an unheralded rule of court in New York in 1921, which followed the English model. This rule (Rule 113) proved so effective in speeding up the calendar that it drew to its support able jurists and writers who have provided leadership for its extension in New York and elsewhere throughout the country * * * With the adoption of Rule 56 of the Federal rules of court procedure and the state systems modeled upon it * * it has become one of the major and most widely adopted of all modern procedural reforms.[11]

### The Federal Rules

Moore asserts (supra, pp. 2072–3):

Summary procedure had operated successfully in all the jurisdictions in which it had been adopted and the tendency had been to enlarge the scope of its operation. The draftsmen of the Federal Rules took cognizance of this tendency to enlarge the scope of the

6. 40 Cal.L.R. 204–5.

7. See Millar, "Three American Ventures in Summary Civil Procedure," 38 Yale Law Journal 193, for discussion of early attempts relating to summary procedure in South Carolina (1769) Kentucky (1805) and Virginia (1849).
And see Clark and Samenow, The Summary Judgment, supra; Paston, Summary Judgment in New York, supra, for discussion of the various state provisions.

8. Rothschild, 5 Ore.L.R. 1, 18 (1925); see also, Rothschild, 19 Cornell L.Q. 364, stating: "Of all the innovations of the Civil Practice Act, this was the most effective, because the soundest——".

9. The Seventh Annual Report of the Judicial Council (1941) reveals (page 31) that annually from 1935 to 1940, summary judgment dispositions for all courts hovered in the areas of "granted" in categories averaging some 60%! (1939—60.5%; 1938—62.4%; 1937—59.2%; 1936—57.5%; 1935—61%). These figures remained constant, viz: the last table of statistics garnered by the Judicial Conference (1956–1957) reveal: 652 motions granted, 447 denied.

10. Saxe, Summary Judgments in New York—A Statistical Study 19 Cornell L.Q. 237, 249–54.

11. Clark, Summary Judgments and a Proposed Rule of Court, 25 Journal of the American Judicature Society, 20–22.

summary judgment procedure. Rule 56 was the first instance where the procedure could be employed in any action, whether formerly denominated legal or equitable, and whether the claim be liquidated or unliquidated.

Chief Judge Yankwich states (*supra*, page 204):

> * * * those who are charged with the administration of justice are constantly seeking new and speedier methods of attaining results through the judicial process. Hence, many procedural tools have been wrought, aiming at the elimination of sham claims and defenses. Among the most important ones is the provision for summary judgment embodied in Rule 56 of the Federal Rules of Civil Procedure.

Continuing, he noted (page 205) that the Advisory Committee on the Federal Rules defined summary judgment in a single sentence: "Summary judgment procedure is a method for promptly disposing of actions in which there is no genuine issue as to any material fact."

Originally, the limited scope of summary judgments in the Federal Courts was pointed up in 1944 by the Supreme Court in Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L. Ed. 967. In any event, Rule 56(c) was amended in 1946–47 and the doubts expressed in *Sartor* were resolved, "making 'clear that although the question of recovery depends upon the amount of damages, the summary judgment rule is applicable and summary judgment may be granted in a proper case'". (6 Moore's Federal Practice, *supra*, pp. 2012–3). The clarifying and broadening "1947 amendments" were submitted by the Supreme Court to Congress, and became effective on March 19, 1948.[12]

Moore's "Federal Practice" argues, in effect, that judicial ingenuity should be used to liberalize the statute, and courts should not be "awed by procedural spectres," conjured up by an illusory introspection concerning summary judgment.

Thus, Professor Moore states (*supra*, at page 2031):

> "Rule 1 admonishes that the Rules 'shall be construed to secure the just, speedy, and inexpensive determination of every action.' If Rule 56 (summary judgment) is applied with wise discernment it will materially aid the general objective of the Rules by eliminating useless trials. * * *"

Similarly, Barron and Holtzoff define the summary judgment rule (*supra*, page 96) as "a far-reaching, progressive reform in judicial procedure. It creates an excellent device to make possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts or if only a question of law is involved. * * * Parties may be accorded expeditious justice and log-jams in congested court dockets may be broken by this means."

### Conclusions Respecting the Instant Case

Counsel for the plaintiff, despite his excellent presentation, has been unable to cite any authority which *squarely* urges or indicates that summary judgment should be granted, absent a specific statute or rule allowing this procedural remedy; nor have we found such an implicit or explicit authority. Indeed the following parallel considerations are consistently contrary to plaintiff's contentions.

A. As defendant's counsel aptly states (Brief, pp. 2–5), summary judgment is a statutory creature—not of common law origin—and the Customs Court has not heretofore promulgated a rule authorizing this extraordinary remedy, despite its power to do so.

Rule 1 of the Federal Rules of Civil Procedure provides that such rules shall apply to procedures in the United States District Courts, and thus Rule 56 (authorizing summary judgment) is not applicable to the United States Customs Court.

12. Rule 56(c) was amended and amplified again, as recently as 1963.

As a parallelism, the United States Court of Claims by its Rule 64, has specifically exercised its rule-making power, and promulgated a summary judgment procedure.

## B. *In the Federal Courts*:

At the outset, it must be noted: the Supreme Court, in the oft-cited case of Miner v. Atlass, 363 U.S. 641, 650, 80 S.Ct. 1300, 1306, 4 L.Ed.2d 1462, rehearing denied, 364 U.S. 854, 81 S.Ct. 31, 5 L.Ed.2d 78, held in part: "The problem then is one which peculiarly calls for exacting observance of the statutory procedures surrounding the rule-making powers of the Court * * * designed to insure that basic procedural innovations shall be introduced only after mature consideration of informed opinion from all relevant quarters with all the opportunities for comprehensive and integrated treatment which such consideration affords."

Socony Mobil Oil Co. v. Pacific Tide, Southern District, N. Y., 189 F.Supp. 724, and Sea Trade Corporation v. Bethlehem Steel Company, Southern District, N. Y., 192 F.Supp. 913, are holding in admiralty, wherein the District Courts found that summary judgment is not a procedural remedy available in admiralty matters. In the latter case, the Court wrote (192 F.Supp. at page 916): "the fact that the Admiralty Rules provide a very limited form of summary procedures without trial by way of exceptions is not sufficient support for finding a power in the district court to deal with broader forms of summary dismissals." And then significantly the Court emphasized (at pages 917–918):

The incorporation into Admiralty of the summary judgment practice is precisely the kind of major innovation which requires resort to the statutory provisions governing the rule-making powers of the Supreme Court. The reluctance of the Supreme Court to permit "a change so basic as to be effectuated through the local rule-making power" serves to guide this court in declining to import summary judgment into Admiralty. * * * No such local summary judgment rule prevails in this district, and for a single judge, absent even the color of authority, to adopt such a basic alteration would be unfounded. * * *

This decision should not be taken as signifying disapproval of the desirability of utilizing a summary judgment procedure in Admiralty. Crowded dockets are not the exclusive province of the Civil side of the federal courts. To subject a case to a long delay and a needless trial when there are no genuine issues as to any material fact is as wasteful in Admiralty as in civil cases. It is hoped that the Judicial Conference and the Advisory Committee on the General Admiralty Rules will give this matter their early attention * * * as suggested in Miner v. Atlass.[13]

Additionally, in Goldlawr, Inc. v. Heiman, 288 F.2d 579, 583, the United States Court of Appeals, Second Circuit, refused to follow the appellant's request that the relevant section did not specifically require personal jurisdiction before transfer, appellant arguing as plaintiff here, that "judicial ingenuity should be used to liberalize the statute." The Court concluded:

The scope of judicial authority should not be lightly extended in the absence of a clear statutory basis. * * * Miner v. Atlass, 1960, 363 U.S. 641, 80 S.Ct. 1300, 4 L.Ed.2d 1462,

13. The Court noted (fn. 27) that "in the interval between decision of this motion and the formal filing of this opinion, the Advisory Committee on Admiralty Rules proposed a Rule authorizing summary judgments in Admiralty. * * * See Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Amendments to Rules of Practice in Admiralty and Maritime Cases, 25—29". Authority for summary judgment in Admiralty is now encompassed within Rule 1 of Federal Rules of Civil Procedure, effective July 1, 1966.

is \* \* \* a warning that federal courts should proceed with caution when considering the merit of implying basic procedural innovations. \* \*

And similarly, the same Court refused to sanction broad depositions sought in an extradition proceeding, stating in part (First National City Bank of New York v. Aristeguieta, 2 Cir., 287 F.2d 219, 225):

> \* \* \* Implicit in Miner, however, is the warning that federal courts must proceed with extreme caution when asked to sanction basic procedural innovations which lie in that misty land where judicial and legislative powers meet. \* \* \*

### C(1)   *In the New York Courts*:

Prior to the summary judgment enactment, even "an obviously false answer prevented judgment." Paston, "Summary Judgment", *supra*, page 5.  As far back as 1871, the New York Court of Appeals refused to strike a false answer, pleading a general denial, thereby declining to grant a judgment without a trial. Thompson v. Erie Railroad Co., 45 N.Y. 468 (1871); Farmers' Nat'l Bank v. Leland, 50 N.Y. 673 (1872).  Latterly too, the New York Courts uniformly refused to pierce a sham defense in causes not specifically delineated by the Rule providing for summary judgment.  "Undoubtedly the right of a plaintiff to move upon affidavits for summary judgment, striking out an answer, is confined to the actions specified in the eight enumerated subdivisions of the rule, \* \* \*.  Under common-law practice the truth of allegations contained in a complaint, or of denials contained in an answer, could be determined only after a trial.  The denials might be sham, the allegations of the complaint might be pleaded recklessly or with knowledge of their falsity, nonetheless, if they conformed to the technical requirements of common-law or equity pleading the truth could be established only by evidence produced and weighed at a trial.  Formalism resting upon an-

cient tradition was the sole recognized test of the sufficiency of a complaint or answer."  (Lederer v. Wise Shoe Co., 276 N.Y. 459, 462–463, 12 N.E.2d 544, 545).

### C(2)   *In Other State Courts*

The Supreme Court of Missouri refused, in Pogue v. Smallen, Mo.Sup., 285 S.W.2d 915, at page 918, to grant a summary judgment, stating flatly: "Regardless of how desirable such a procedure may be [summary judgment remedy utilized by Federal Rules Civil Procedure, rule 56, 28 U.S.C.A.] its use is not authorized in Missouri."

Again, in Cook et al. v. Cramer Cotton Co., 155 Ark. 549, 244 S.W. 730, the Supreme Court of Arkansas reversed the judgment of the lower court which granted a summary judgment, stating (*id.* at 730):

> Proceedings for summary judgment are in derogation of the common law, and such judgments can be rendered in those cases only in which express authority therefor is found in the statute, and, as we have said, we know of no statute authorizing the judgment rendered herein. \* \* \*

To the same effect, Professor Wright (101 U. of P.Law Review 909, 937) decried the necessity of holding a trial in Pennsylvania, "for there is no procedure to dispose of the claim more expeditiously", in a similar case where summary judgment was granted to defendant in the Court of Appeals, Second Circuit "by two judges who have been most conservative in their allowance of summary judgment." [14]

### *Finding*

■ We are required, under all the circumstances, to deny plaintiff's motion for summary judgment.

But we cite:

Mr. Justice Stone, in a memorable address on "The Common Law of the United States", discussed innovations and his disfavor with an attitude of narrow lit-

14.  Dyer v. MacDougall, 201 F.2d 265 (2d Cir. 1952).

**516**

eralism. He said: "A statute (or rule) is not an alien intruder in the house of the common law, but a guest to be welcomed and made at home there as a new and powerful aid in the accomplishment of its appointed task of accommodating the law to (vital) needs." [15]

and

Mr. Justice Shientag of the New York Supreme Court, in his Summary Judgment (Introductory Paragraph), who said:

"The charge is frequently made that the reformer is impractical. That charge can hardly be said to attach to those who took the lead in the adoption and extension of the rules providing for summary judgment in this state."

15. The Future of the Common Law, Harvard U. Press, pp. 120, 132–3.