**Malcolm WEISS, et al., Plaintiffs,**

v.

**YORK HOSPITAL, et al., Defendants.**

**Civ. No. 80–0134.**

United States District Court,
M. D. Pennsylvania.

Sept. 25, 1981.

Lewis H. Markowitz, Marc G. Tarlow, Markowitz & Seidensticker, P.C., York, Pa., Arnold Levin, Michael D. Fishbein, Adler, Barish, Levin & Creskoff, Philadelphia, Pa., for plaintiffs.

Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., for defendants.

## OPINION

MUIR, District Judge.

This action is presently before the Court on the Defendants' motion for summary judgment filed June 1, 1981, and supported by a memorandum of law, exhibits, and affidavits. The motion was opposed by a brief of the Plaintiffs accompanied by exhibits and affidavits filed June 23, 1981, to

which the Defendants replied on July 7, 1981.

This is an action brought under §§ 1 and 2 of the Sherman Antitrust Act of 1890[1] and Sections 4 and 16 of the Clayton Act of 1914,[2] 15 U.S.C. §§ 1, 2, 15, and 26, and pursuant to the common law of Pennsylvania in which the Plaintiff, a Doctor of Osteopathy, alleges that the Defendants have individually and collectively prevented him and other osteopaths from gaining staff privileges at York Hospital solely because the Plaintiff and members of the Plaintiff class are Doctors of Osteopathy. Dr. Weiss also contends that the Defendants have monopolized the health care services and facilities within the relevant market area to the Plaintiff's detriment. The procedural history of this case will not be set forth at length; it is sufficient for the purposes of the present opinion to note that on May 28, 1981, following a hearing on the matter, Plaintiff's motion for class certification was granted and a class consisting of all osteopathic physicians within the relevant market area was certified and that this matter was scheduled to be tried during August 1981. Although a jury was drawn, the trial was aborted by an appeal on the eve of trial on a discovery point crucial in this Court's view to the trial and the trial was stayed pending action by the Court of Appeals.

## I. Defendants' Evidence.

An analysis of the merits of the pending motion must begin with the examination of the affidavits and other exhibits submitted in support of the motion because "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c); *Abdallah v. Caribbean Security Agency,* 557 F.2d 61 (3d Cir. 1977); *Scott*

*v. Plante,* 532 F.2d 939, 945 (3d Cir. 1976); *Goodman v. Mead, Johnson and Company,* 534 F.2d 566 (3d Cir.), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1976).

The documents filed in support of the Defendants' motion fall generally into two categories consisting of (1) the affidavits of each individual Defendant and of the representatives of the corporate defendant and (2) documentation concerning the rejection of Dr. Weiss's application for staff privileges at York Hospital. The affidavits by individual Defendants, all Doctors of Medicine, associated with York Hospital, are identical. Likewise, the affidavits of the individual members of the Board of Directors of York Hospital (16 in number) are identical to one another. Only the affidavit of Merle Bacastow, M.D., Vice President of Medical Affairs for York Hospital, is unique and need be addressed at any length.

The affidavits of Drs. Ardison, Bauer, Butler, Kline, and Kushner, establish that each was a member of the Executive Committee of York Hospital in 1977 and 1978 when Dr. Weiss's applications for staff privileges were received and acted upon. Each doctor's affidavit states that the vote cast by the affiant in the decisions whether to grant Dr. Weiss staff privileges was accomplished without regard for, or consideration of, the fact that Dr. Weiss was not an allopathic physician and further, that during the 1977 and 1978 discussions of Dr. Weiss's applications, the Executive Committee members did not discuss the fact that Dr. Weiss is an osteopathic physician. Finally, each affidavit states that the statement of reasons for the denial of application for medical staff privileges of Dr. Weiss with which he was provided correctly sets forth the basis upon which the committee determined on April 19, 1978 to recommend denial of Dr. Weiss's application.

The next group of affidavits is by Drs. Deisher, Lauchs, MacDougall, MacKenzie,

1. Act of July 2, 1890, c. 647, 26 Stat. 209, 15 U.S.C.A. §§ 1–7 (1976), as most recently amended by Act of December 12, 1975, Public Law 94–145, CCH Trade Reg.Rep. ¶ 25, 125 (1976), effective March 11, 1976.

2. Act of October 15, 1914, c. 323, 38 Stat. 730, 15 U.S.C.A. §§ 12–27 (1976), as amended by Act of September 30, 1976, Public Law 94—435, 90 Stat. 1383.

and Whiteley, all of whom comprised the Judicial Review Committee which was specially convened to hear the appeal of Malcolm Weiss from the April 19, 1978 decision of the Medical Staff Executive Committee to recommend to the Board of Directors of York Hospital that Dr. Weiss's application for staff privileges be rejected. Each affidavit reflects that on December 12, 1978, after extensive evidentiary hearings, the committee determined that the April 19, 1978 decision of the Executive Committee was not erroneous, unreasonable, arbitrary or capricious, and that, accordingly, the decision of the Executive Committee was upheld. Each of these affiants further states that Dr. Weiss's educational background was not a consideration in the determination by the Judicial Review Committee to uphold the ruling of the Board of Directors on Dr. Weiss's application for staff privileges.

The last group of affidavits, executed by each individual member of the Board of Directors of York Hospital, states that the affiant participated in the decision on March 13, 1979 to deny Dr. Weiss staff privileges, and that the fact that Dr. Weiss was an osteopathic physician did not enter into the affiant's decision concerning Dr. Weiss's application.

In his affidavit, Dr. Merle Bacastow states that he has been Vice-President for Medical Affairs of York Hospital since May of 1972 and, as such, his duties have included the supplying of York Hospital Medical Staff application forms to physicians requesting them, the receiving of completed application forms by physicians seeking York staff privileges, and the administrative processing of those applications. In connection with such applications, Dr. Bacastow states that he maintains separate files on each application, solicits relevant background and reference information on the applicants, and assists the Staff Credential Committees, the Staff Executive Committee, and the York Hospital Board of Directors in making the applicants' files available for their reviews, recommendations, and ultimate decisions. Dr. Bacastow describes the staff privilege application procedure as follows:

Once an application is received and background and reference information gathered, (1) an evaluation of the application is made by the chairman of the hospital department in which the applicant seeks privileges. In some instances, such as the family practice department, the department chairman selects a departmental credentials committee to assist him in the formulation of an evaluation (of the applicant). (2) Upon its review of the application, the Staff Credentials Committee makes its recommendation to the Staff Executive Committee. (3) The Staff Executive Committee, upon receipt by it of the recommendation by the Staff Credentials Committee, independently reviews the application in light of the Credentials Committee recommendation. The Executive Committee then forms its recommendation and forwards that information to the hospital's Board of Directors. (4) The Board of Directors routinely refers the application to its Medical Affairs Committee which is composed of representatives of the hospital administration, the staff executive committee, and the Board of Directors, and is chaired by a member of the Board of Directors. The Medical Affairs Committee usually recommends a disposition of the application. (5) After consideration by its Medical Affairs Committee, the Board of Directors has complete, plenary authority to decide whether to accept or reject an application.

During the application review procedures described, any committee to which the application is referred may request further information concerning the applicant either from the applicant or another source. Bacastow states that since May of 1972 only four osteopathic physicians have applied for membership on the York Staff and that of the four, Plaintiff Weiss is the only applicant to be denied staff privileges. Two osteopaths, Michael A. Zittle and Kenneth E. Yinger, were granted staff privileges on June 30, 1977 and December 30, 1980, respectively. One of the four applications by osteopathic physicians for membership on

the York Hospital staff made since May 1972 is pending, awaiting supplemental information previously requested from the applicant.

The bulk of the remainder of Dr. Bacastow's affidavit is concerned with the identification and authentication of the exhibits to the doctor's affidavit. It should be noted that among the exhibits to Dr. Bacastow's affidavit are all but two of the exhibits filed by Defendants in support of the motion under separate cover and which have earlier been referred to in this opinion as the second category of documents in support of the motion. These exhibits consist primarily of letters and other memoranda received or prepared by the Defendants in this action in connection with Dr. Weiss's application for staff privileges.

## II. Plaintiff's Documents.

Plaintiff's evidence in opposition to the motion consists of many of the same documents submitted by Defendants, as well as minutes of various hospital committee meetings, proposed revisions of hospital by-laws, and the transcript of the Judicial Review Committee hearing.

Dr. Weiss also submits his own affidavit in which he states that within the last 10 years he has served as a physician at Pleasant Acres Nursing facility, in which capacity he has noted that a substantial number of patients were admitted to York Hospital from that facility, and that Dr. Zittle, an osteopathic physician who received staff privileges at York Hospital, was the Chief Physician and Medical Director of Pleasant Acres when his application was accepted by York Hospital. Similarly, Weiss avers, Dr. Yinger, another osteopathic physician whose application for staff privileges was recently accepted by York Hospital, was the Chief Physician and Medical Director of Pleasant Acres when his application for staff privileges was accepted. Further, Weiss avers that he has spoken to other osteopathic physicians in the county who have indicated to him that they would not apply to York Hospital for staff privileges because of the treatment which he (Weiss) received, and that they stated to Weiss that they believed that their applications would be unfairly denied because York Hospital does not wish to accept osteopathic physicians. Finally, Weiss states that he has not had an opportunity, nor has his counsel, to review the files relating to the applications for staff privileges to York Hospital of all allopathic physicians during the last five years.

In his memorandum in opposition to the Defendants' motion, Dr. Weiss also relies upon and cites extensively to the results of discovery undertaken by him. Of particular interest among these references are portions of the transcript of Dr. Bacastow's deposition and the depositions of Drs. Butler and Deisher. In those documents, all three doctors acknowledge that they consider osteopathic physicians as well qualified as allopathic physicians generally. (Bacastow Tr. 27, Butler Tr. 15, 16, Deisher Tr. 20). Dr. Bacastow also testified that only one allopath had ever been denied staff privileges, and that denial was on the basis of psychiatric problems. (Bacastow Tr. 622). Finally, Plaintiff points to Defendants' responses to Plaintiff's first set of interrogatories for the information that allopathic physicians' applications for staff privileges are acted upon within four months.

## III. Discussion.

The Defendants' legal argument in support of the motion for summary judgment is rather easily summarized because of its extensive reliance upon the affidavits of the members of the Executive Committee, the Judicial Review Committee, and the Board of Directors. At length, and repeatedly, Defendants submit that the affidavits establish that the actions of the individuals comprising those bodies reveal that no animosity toward osteopaths generally and towards Dr. Weiss specifically was involved in the decision to deny Weiss staff privileges. More precisely, Defendants' argument is that the affidavits establish that there is no disputed material fact concerning the reasons for the rejection of Weiss's application and that, accordingly, the Defendants are entitled to summary judgment.

In support of their argument, Defendants cite such cases as *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), in which the Supreme Court sustained the grant of summary judgment in a federal antitrust damage suit, holding that Rule 56(e) imposes upon the Plaintiff the burden of producing admissible evidence of the alleged conspiracy once Defendants have shown that the facts do not support the Plaintiff's allegations. Similarly, Defendants rely upon *Tripoli Company v. Wella Corporation*, 425 F.2d 932 (3d Cir. 1970) (en banc), *Weit v. Continental Illinois National Bank and Trust Company*, 641 F.2d 457, 462 (7th Cir. 1981), *Nifty Foods Corporation v. Great Atlantic and Pacific Tea Company*, 614 F.2d 832, 839 (2d Cir. 1980), and *Daley v. St. Agnes Hospital, Inc.*, 490 F.Supp. 1309 (E.D.Pa.1980). Additionally, the *Tripoli* and *Weit* cases are cited in support of the proposition that once Defendants come forward with a denial sufficient to shift the burden under Rule 56(e), the Plaintiff must produce significant probative evidence which suggests that Defendants' conduct is the result of an unlawful agreement. The case of *Program Engineering v. Triangle Publications*, 634 F.2d 1188, 1195 (9th Cir. 1980) is relied upon for the proposition that summary judgment is appropriate where the Defendants have denied the conspiracy and offered legitimate business reasons for each of the allegedly conspiratorial acts.

Defendants submit that the documents submitted by them support the conclusion that a legitimate business purpose was served by the rejection of Dr. Weiss's application for staff privileges because of the negative information received by Defendants about Dr. Weiss from certain sources. In further support of this argument, Defendants refer the Court to the principle that hospitals may be liable for negligence in improvidently admitting physicians to their staffs.

Finally, Defendants submit that the Plaintiffs have stated no claim of common law violation because the acquisition of hospital staff privileges is not a legally enforceable right of any licensed physician.

This Court is well aware that the device of the motion for summary judgment has as its intended result the elimination of unnecessary trials in actions where "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Weather-Rite Sportswear Company v. United States*, 298 F.Supp. 508 (Cust.Ct.1969). However, it does not follow from either the rule itself or case law that the device of the motion for summary judgment may be employed in order to circumvent a Plaintiff's right to a jury trial. Thus, while the summary judgment rule allows for the use of affidavits in order to establish that there is no triable issue of fact, the party submitting the affidavits must also establish that the affidavits are true. It is often repeated that it is not the Court's function actually to determine issues of fact, but solely to decide whether there is an issue of fact to be tried, and in keeping with this philosophy, Courts are to resolve all doubt as to the existence of a genuine issue of material fact against the party moving for summary judgment. *Toebelman v. Missouri-Kansas Pipeline Company*, 130 F.2d 1016, 1018 (3d Cir. 1942); *Weisser v. Mursam Shoe Corporation*, 127 F.2d 344 (2d Cir. 1942); *Sarnoff v. Ciaglia*, 165 F.2d 167 (3d Cir. 1947); *Fairbanks, Morse and Co. v. Consolidated Fisheries Company*, 190 F.2d 817 (3d Cir. 1951).

The reluctance of Courts to allow the use of the motion for summary judgment to deprive Plaintiffs of the right to jury trial explains such sentiments as those expressed by Professor Moore in 6 Moore's Federal Practice ¶ 56.15[4], p. 56–514, to the effect that on the whole, affidavits are the least satisfactory forms of evidentiary materials upon which to base a summary judgment. Although affidavits are subject to the requirements set forth in Rule 56(e) that they be made upon personal knowledge, setting forth facts which would be admissible in evidence and showing affirmatively that the affiants are competent to testify to the matters stated, the fact that an affiant's

demeanor is not observable by the Court is not insignificant.

Because motive and intent play leading roles in antitrust litigation, *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), it is often said that summary judgment under Rule 56 should be granted where it is clear not only that the facts of the controversy are not in dispute, but also that there is no dispute as to the inferences to be drawn from the facts. Moreover, when the disposition of a case turns on a determination of intent, the Court must be particularly cautious since the resolution of that issue turns upon the credibility of witnesses which would be best determined by the trier of facts. *Morrison v. Nissan Company, Ltd.*, 601 F.2d 139 (4th Cir. 1979).

The intent of the Defendants is a significant factor. Hence, it is not surprising that the Defendants' affidavits go almost entirely to the question of whether there was an intent on the part of any of these Defendants to deny Dr. Weiss staff privileges at the York Hospital because he is an osteopath. The Plaintiff has no way of controverting such affidavits *directly*.

Despite the sheer volume of materials submitted by the Defendants concerning Dr. Weiss's application for staff privileges at York Hospital, not to mention the argument concerning responsibility of the hospital for employment of negligent physicians, the Defendants' documents simply do not present the picture of Dr. Weiss the Defendants would have this Court visualize. Only a few of the Defendants' documents actually contain negative responses concerning Dr. Weiss's professional ability, and the information in the documents upon which the Defendants would have this Court rely is hearsay. For example, the letter of Kenneth Woerthwein, M.D. to Donald Piper, M.D. dated April 18, 1977 suggests that Dr. Weiss misdiagnosed his patients' ailments. The writer of that letter, however, does not reveal whether the source of his information was the patients themselves or the records of the patients' treatment prepared by Dr. Weiss. Obvious-

ly, patients' descriptions of Dr. Weiss's diagnoses as conveyed to Dr. Woerthwein are not made by him and are not firsthand information. At best, it is unclear what foundation is laid for the conclusion that Dr. Weiss made incorrect diagnoses of some patients' conditions. Another example of a document which Defendants claim supports the conclusion that Dr. Weiss did not merit professionally the grant of staff privileges at their institution is the memo of R. J. Herman, M.D. to the York Hospital Credentials Committee dated November 3, 1977, in which Dr. Herman states that he spoke with a representative of the Department of Public Assistance and State Department of Health in York, Pennsylvania, and was told that patients had complained about Dr. Weiss's incomplete examinations of their children. Although the Defendants may have found the information contained in these documents sufficient for their purposes in rejecting Dr. Weiss's application, this Court cannot base its disposition of a motion for summary judgment on the evidence presented to it.

Other of the Defendants' documents persuade this Court that a grant of summary judgment in favor of the Defendants in this matter is inappropriate. Many of the letters of reference which the Defendants would have the Court construe as detrimental to Dr. Weiss are simply not detrimental. While, for example, the letters of G. Bradford Myers, M.D. to Merle Bacastow, M.D. dated March 9, 1977 and Roy Cammer, D.O. to Donald Piper, M.D. dated April 16, 1977, establish that the writers had firsthand knowledge of Dr. Weiss's tendency to assert his rights and even suggest that Weiss had been involved in incidents in which he and his patients failed to get along harmoniously, these and other letters also note Weiss's professional competency. Furthermore, no document in this record contains evidence that Weiss was unable to work harmoniously with support staff. Contrary to the Defendants' argument, their documents do not establish a legitimate business purpose for denying Dr. Weiss staff privileges at the York Hospital.

.

.

Above and beyond the failure of Defendants' documents to establish that Dr. Weiss is professionally incompetent is the fact that the Defendants' documents are rife with procedural inconsistencies, unaccounted for changes in attitudes and recommendations, and unexplained omissions. Dr. Bacastow's affidavit establishes the procedure to be followed upon receipt by the Hospital of an application for staff privileges. However, Defendants' documents do not establish that the procedures outlined were followed with regard to Dr. Weiss. Dr. Bacastow's memorandums (to Weiss's file) concerning conversations with Dr. Lasser which appear to be directly contradicted by the letters written by Dr. Lasser himself concerning Dr. Weiss are perplexing. In the omission category falls the document prepared by H. H. MacDougall, M.D., lone dissenter in the decision of the Judicial Review Committee to uphold the Board of Directors' decision to deny Weiss staff privileges. In this document, dated December 27, 1978, Dr. MacDougall states:

> The descending [sic] vote was not against the actions of any of the previous committees, staff, or administration of the York Hospital regarding Dr. Weiss's application for privileges on the staff of the York Hospital. In fact, I would like to add that I do approve of what has been done but I believed then that an affirmative vote would not convey my personal thoughts about such action.
>
> Everyone knows that time brings on changes in conditions and personalities and I believe that the conditions and situations at the York Hospital regarding privileges may change in the future and I believe that Dr. Weiss's actions since his early experiences with the Memorial Osteopathic Hospital have changed. These changes are in the direction of conformity and less disagreement with established systems. Therefore, I believe it would be advisable for Dr. Weiss to reapply in about five years when all conditions may have changed even further and be more conducive to Dr. Weiss's acceptance.

Although it may be that Dr. MacDougall alludes in this statement only to Dr. Weiss's personality and the problems he has been accused of having with other staff and patients, it is not unreasonable to infer from this document that Weiss's personality alone is not the difficulty.

Repeatedly, Defendants point to a statement made by Plaintiff's counsel at the hearing upon Plaintiff's motion for class action certification to the effect that Plaintiff's claims rise and fall on the allegation that Defendants refused to grant him staff privileges solely because he is an osteopathic physician, and if there were in fact no more to the Plaintiff's allegations, the Defendants' affidavits might entitle them to summary judgment. However, as Defendants themselves argue in their reply brief, statements of counsel in briefs and oral argument are not evidence. *See Williams v. Murdoch*, 303 F.2d 742 (3d Cir. 1964) at n. 3; *James v. H.M.S. Port Lyttleton Port Line Ltd.*, 51 F.R.D. 216, 218 (E.D.Pa.1971). In fact, the Plaintiff's First Amended complaint is far more explicit than Defendants acknowledge. Dr. Weiss alleges that the Defendants, in violation of Sections 1 and 2 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 1, 2, 15 and 26, have combined to preclude osteopathic physicians generally from staff membership at York Hospital in an attempt to monopolize and suppress competition in the health care industry in the pertinent market area. The allegations are grounded upon the facts that York Hospital is larger and more thoroughly equipped than Memorial Osteopathic Hospital and that the extent of York's resources cannot be overcome because of Certificate of Need laws (e. g. Health Care Facilities Services Act, Act of July 19, 1979, No. 1979–48 to be codified at 35 P.S. §§ 448.101–904). In support of his motion for class action certification, the Plaintiff more specifically identified the nature of the actions of Defendants about which he complains. These are not, as Defendant argues, new allegations not found in the amended complaint. Rather, they are the specific acts which the Plaintiff intends to prove were committed by the Defendants which constitute the antitrust violations al-

leged. Had the Defendants filed a motion for a more definite statement of claim, and had the motion been denied, or had the Plaintiff failed to make these allegations, the point now made by the Defendants in the instant motion might have some merit.

Obviously, proof that the Defendants have engaged in restraint of trade and monopolization of health care services must consist of a showing of more than the simple fact that the Plaintiff is not a member of the York Hospital staff. In order to establish monopolization, the Plaintiff must show that the Defendants have deliberately followed a course of market conduct through which they have obtained or maintained the power to control prices or exclude competition in some activity protected by the Sherman Act. *United States v. Grinnell Corporation*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. E. I. DuPont De Nemours and Company*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *United States v. American Tobacco Company*, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911); *Standard Oil Company of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

While Defendants would complain about the way in which Plaintiff plans to prove his case, neither Defendants' affidavits nor their legal argument substantively address the legal sufficiency of those claims as they relate to the Clayton and Sherman Acts. On the other hand, the Plaintiff's evidence goes concisely to his allegations. For example, Plaintiff has submitted a report on patient origin and demographic studies prepared by York Hospital which identifies clearly the market area served by that entity and contains data from which, at trial, Plaintiff may be able to evaluate the extent of the power wielded within that market. Barriers to entry have also been deemed relevant in determinations of whether a level of concentration indicates monopoly power. *United States v. United Shoe Machine Corporation*, 110 F.Supp. 295 (D.Mass. 1953), *aff'd* per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). Plaintiff avers that other doctors of osteopathy have indicated to him that their reasons for declining to apply for staff privileges at York Hospital are their beliefs that their applications will be dealt with unfairly because they are osteopaths. The suggestion of Dr. Weiss that only Doctors of Osteopathy who are in a position to make *numerous* referrals to York Hospital are granted privileges by York (and, conversely, that only those Doctors of Osteopathy with the largest need for privileges are granted them) speaks to Plaintiff's antitrust allegations.

■ Two final arguments of Defendants need be addressed briefly. The Court refers first to the argument contained in Defendants' reply memorandum that it is a requirement of the antitrust laws that a demand be present in a "refusal to deal" case. Although the Defendants comment in that brief that the issue has been argued by the parties at length, Defendants refer to briefing submitted on the question of Plaintiff's motion for a class action designation. The question is not briefed in Defendants' memorandum in support of the motion now pending, and to the extent that the Plaintiffs have addressed the question in their memorandum, they have done so in a vacuum without benefit of the Defendants' position for the present purposes. For this reason, the Court is of the opinion that this legal issue is not now properly before it. Similarly, the matters contained in a document submitted June 18, 1981 entitled "amendment to memorandum in support of Defendants' motion for summary judgment" will not be considered. Quite apart from the fact that there is no authority in the Rules for the United States District Court for the Middle District of Pennsylvania or this Court's practice order for the submission of such a document, the Plaintiffs have had no opportunity to respond to the matters contained therein and any response by them would, likewise, be unauthorized. Having made the motion now before the Court, it was incumbent upon the Defendants to garner and submit all of the legal and documentary ammunition available to them at the times and in the sequence provided for by the rules under which this Court operates. Absent adher-

ence to these rules, as this motion demonstrates, both this Court's and the parties' tasks in any given undertaking will be endless. Despite these observations, and rather than give rise to an inference that the Court refused to evaluate Defendants' motion on the basis of a "technicality" alone, the "demand and refusal" concept is considered below. Defendants' argument concerning Plaintiff's state law claims will also be considered.

In *Lawlor v. National Screen Service Corporation*, 270 F.2d 146 (3d Cir. 1959), *cert. denied*, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960), the Court of Appeals applied to the circumstances of that case the rule enunciated in such cases as *Webster Rosewood Corp. v. Schine Chain Theatres, Inc.*, 263 F.2d 533 (2d Cir. 1959) and *J. J. Theatres, Inc. v. 20th Century Fox Film Corporation*, 212 F.2d 840 (2d Cir. 1954), that the failure of the Plaintiff to attempt to obtain from any of the defendants licenses under which the Plaintiffs could manufacture the accessories in question, (and where, in fact, Plaintiffs had expressly stated that they did not desire to obtain such licenses), there could be no recovery in an anti-trust action. In a case decided more recently, the Court of Appeals reaffirmed the position it had taken in *Lawlor* that where an accumulation of licenses was alleged to prevent effective competition in violation of the anti-trust laws, there was no such violation where no demand for a share in the licenses in question had been made by the Plaintiffs. *Fleer Corporation v. Topps Chewing Gum, Inc., et al.*, 658 F.2d 139 at p. 150 (3d Cir. 1981). However, Defendants fail to point out the Court's reliance on Justice Brandeis's opinion in *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918) (enunciating the criteria for scrutinizing the legality of a restraint under the rule of reason) and the comments by the Court of Appeals immediately following their quote of Justice Brandeis's language to the effect that the facts peculiar to the business involved in the litigation and the history of the restraint were crucial to its determination. *Fleer* at 148.

Assuming without deciding that the rule of reason, and not the per se test, is applicable here, the Court is unpersuaded that the facts, and subsequently the law, of the *Lawlor* and *Fleer* cases control in the instant matter. In another case cited by Defendants, *Smith v. Northern Michigan Hospitals, Inc.*, 518 F.Supp. 644, 1981–2 trade cases (CCH), ¶ 64, 181 (W.D.Mich.1981), it is noted cogently that:

> It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect and other features of the professions may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently.... *Citing Goldfarb v. Virginia State Bar* (1975–1) Trade Cases ¶ 60, [355], 421 U.S. 773 [95 S.Ct. 2004, 44 L.Ed.2d 572] (1974).

And while in *Smith* the District Court found no antitrust violations, it did so subsequent to its specific finding of, among other things, the fact that the Defendants had a legitimate medical and financial purpose in consolidating the emergency rooms in question and in making referrals in the manner in which they did.

In *Lorain Journal v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), the Supreme Court addressed itself to a situation in which a newspaper, in an attempt to monopolize the dissemination of news and advertising in its area, refused to accept advertisements from anyone who advertised with the competitor it sought to eliminate. Obviously, that situation presented no circumstances in which the object of the conspiracy had attempted to deal with the alleged monopolist and had been refused; at the very least, the facts of *Lorain* illustrate that the concept of demand and refusal must bear a rational nexus to the facts of any given case. The Court is also in agreement with the Plaintiff's comment that what is essentially a "causation" principle embodied in the demand and refusal cases such as *Lawlor* and

*Fleer,* is not applicable where monopoly power exists and is abused. *See, e. g., United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1947); *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *L. G. Balfour Company v. F.T.C.,* 442 F.2d 1 (7th Cir. 1971).

■ Defendants' request for summary judgment on Plaintiff's state law claims will also be denied. With respect to these claims, Defendants have addressed only the denial of staff privileges, and not any of the other abuses alleged by the Plaintiff. With respect to the denial of staff privileges, moreover, Defendants argue that the Plaintiff has no "contract" cause of action. In support of this argument, Defendants cite such cases as *Berberian v. Lancaster Osteopathic Hospital Association,* 395 Pa. 257, 149 A.2d 456 (1959) and *Schneir v. Englewood Hospital Association,* 91 N.J.Super. 527, 221 A.2d 559 (N.J.Law 1966) and *Miller v. Indiana Hospital,* 277 Pa.Super. 370, 419 A.2d 1191 (1980). However, these cases appear to stand for the general proposition that hospital staff privileges may be withheld or revoked providing a hospital has complied with its applicable by-laws. At least one fallacy of Defendants' argument is that, contrary to the cases cited by them, the facts of the instant case do not establish that the actions of the Defendants in this matter were consistent with the provisions of the by-laws governing the granting of staff privileges. Further, Plaintiffs' state law claims may be addressed under the tort of intentional interference with contractual relations. This fact, together with the fact that the Defendants' motion for summary judgment as to the state antitrust law claims is predicated upon the argument that once federal antitrust law claims are dismissed no state law claims remain, warrants denial of the Defendants' motion concerning Plaintiff's state law claims.

### IV. Conclusion.

The outcome of this litigation will have an impact not only upon the parties, but will also be felt by the entire medical community of York, Pennsylvania. The evidence adduced and legal arguments presented have been painstakingly reviewed and analyzed. The conclusion has been reached that the Defendants have failed to establish that they are entitled to summary judgment *as a matter of law.* Fed.R.Civ.P. 56. Numerous questions of fact material to the issues of law presented by this matter remain in dispute. Defendants have not conclusively demonstrated that Dr. Weiss was refused staff privileges solely for reasons unrelated to his status as an osteopathic physician. There is no evidence in the record that personality traits of allopathic physicians are considered in the context of those persons' applications for staff privileges. It is not clear that the procedures outlined in the Bacastow affidavit were followed in the case of Dr. Weiss's application for staff privileges, and it is not established why they were not. The question of the reason that the processing of Dr. Weiss's application took so long is unanswered. All of these unresolved questions appear to bear materially upon the allegations that Defendants have monopolized the health care field and restrained trade therein by excluding osteopaths from their institution. The Defendants' motion for summary judgment will be denied.