Ricky Lee **HISEL, S. James Cello-Whitney, Jr., and James M. Shuff, Plaintiffs,**

v.

**James R. UPCHURCH, et al., Defendants.**

No. CIV 89–1666–PHX–EHC (MM).

United States District Court, D. Arizona.

April 16, 1992.

---

Ricky L. Hisel, pro se.

S. James Cello–Whitney, pro se.

James M. Shuff, pro se.

Atty. Gen.'s Office, Asst. Atty. Gen. Phoenix, Ariz., for defendant Robert J. Sorce.

## ORDER

CARROLL, District Judge.

On March 16, 1990, Plaintiff, S. James Cello–Whitney, (Cello–Whitney) signed a "General Release" whereby he agreed to dismiss with prejudice each of his cases pending in Arizona and Washington, concerning matters arising from his incarceration in Arizona, in exchange for his immediate transfer to the custody of the State of Washington. (Exhibit B to Doc. 92.)

On March 19, 1990, an Order of Transfer was issued transferring Cello–Whitney to a correctional facility in Washington. He was transferred on March 20, 1990. (Exhibit 7 to Doc. 135.)

On March 21, 1990, Cello–Whitney filed a "Motion for Order of [sic] Show Cause and Vacating of [sic] Plaintiffs [sic] Signature." (Doc. 60.) He filed virtually the same motion in each of his active cases pending before this Court.[1] Cello–Whitney alleges, *inter alia*, that though he signed the release, he did so under duress, fraud, and misrepresentation, and therefore did not give his consent freely. The motion was signed on March 16, 1990, the same day Cello–Whitney signed the release.

Cello-Whitney's motion is denied.

### BACKGROUND

In July of 1988, Cello–Whitney was transferred from the custody of the Washington Department of Corrections (WDOC) to the custody of the Arizona Department of Corrections (ADOC), pursuant to the Western Interstate Corrections Compact Act, A.R.S. § 31–471 et seq., and the Interstate Corrections Compact, A.R.S. § 31–491 et seq. (Complaint in *Cello–Whitney v. Lewis*, CIV 88–1317 PHX EHC (MM)). The record demonstrates convincingly that he regarded the transfer as retaliatory for his litigiousness in Washington. (*See e.g., Id.*) As a result, his demands to be returned to Washington have been adamant since arriving in Arizona.

ADOC held Cello–Whitney in the Special Management Unit (SMU) at the Arizona State Prison Complex in Florence. SMU allows inmates fewer privileges, and demands much more isolation than the general population is accustomed to. Nevertheless, Cello–Whitney frequently availed himself of the institution's law library and library staff for the purpose of pursuing litigation on his own behalf, as well as other inmates. Indeed, this Court and the Magistrate Judges have admonished Cello–Whitney a number of times that, because he is not an attorney, he could not represent other inmates.

Between July of 1988 and March of 1990, when he was transferred back to the custody of Washington, Cello–Whitney succeeded in wielding the processes of this Court in such a way as to convince his Arizona custodians to return him to Washington. (*See e.g.* Exhibit 2 to Doc. 162, in which James R. Upchurch (Upchurch), Deputy Warden of the Special Management Unit at the Arizona State Prison Complex in Florence states "[i]t has become apparent to me that inmate Cello–Whitney poses too great an expense to the taxpayers of Arizona to maintain him at SMU ... I have stubbornly felt that we could effectively deal with inmate Whitney's behavior, but failed to recognize the serious implications of his 'manic states' relative to the manner in which he has chosen to strike out, that being through the courts"; Exhibit A to Doc. 71, in which Cello–Whitney informs June Ava Florescue (Florescue), Assistant Attorney General, on March 13, 1990, "[i]t is no big secret ADOC is extremely anxious to have me depart. Likewise, I am very well aware of the fact ADOC no longer wants the burden of me, the costs or the continuing flow of litigation. Unfortunately, that is too bad. You people insult my intellect and good faith. As it sits for the immediate moment I am prepared to contin-

---

1. What follows is a list of those cases in which the motion was filed. It is noteworthy, however, that the release encompasses all cases filed by Cello–Whitney "concerning his incarceration, [ ] terms and conditions thereof, or any other matters, while in the physical custody of the Arizona Department of Corrections:"
    1. *Cello–Whitney v. Lewis*, CIV 88–1317 PHX EHC (MM) (Doc. 60.)
    2. *Cello–Whitney v. Zater*, CIV 88–1537 PHX EHC (MM) (Doc. 211.)
    3. *Cello–Whitney v. Kirby*, CIV 89–826 PHX EHC (MM) (Doc. 19.)
    4. *Cello–Whitney v. Zell–Terry*, CIV 89–827 PHX EHC (MM) (Doc. 46.)
    5. *Hisel v. Upchurch*, CIV 89–1666 PHX EHC (MM) (Doc. 60.)
    6. *Cello–Whitney v. Boes*, CIV 89–1674 PHX EHC (MM) (Doc. 62.)
    7. *Cello–Whitney v. Hassenzella*, CIV 89–1965 PHX EHC (MM) (Doc. 44.)
    8. *Cello–Whitney v. Hayes*, CIV 90–129 PHX EHC (MM) (Doc. 9.)
    9. *Shuff v. Upchurch*, CIV 90–131 PHX EHC (MM) (Doc. 8.)

ue proceeding in every case and remaining right here in Arizona and at this point do not particularly care whether or not anyone likes it. The bottom line is you people and WA/DOC deliver unto myself and Mr. Shuff the terms requested and ADOC WA/DOC and the AG's involved may have EVERY PENDING CASE. In fact I want out of the litigation business period on every case and you people have my requests and specifications ... If need be I'll bring ADOC to its knee's [sic] in my time.") Cello–Whitney's exercise of his right to prosecute alleged violations of his constitutional rights, pursuant to 42 U.S.C. § 1983, has spawned numerous actions in this Court as well as the courts of Washington.[2]

The tenor and process in the case at hand are representative, generally, of those in each of Cello–Whitney's other sixteen cases currently pending before this Court.[3]

### FACTS

The undisputed facts are as follows:

Cello-Whitney, James M. Shuff (Shuff), and Ricky L. Hisel (Hisel) filed an Amended Complaint in this action on February 1, 1990.[4] Plaintiffs allege "unsanitary conditions and mental cruelty and abuse of ad-ministrative discretion amounting to cruel and unusual punishment, aggravated retaliation and harassment, legal interference, denial of due process, assault and conspiracy." [5] (Doc. 31 at 2–3.) Plaintiffs complain primarily of the conditions of confinement. The Amended Complaint names eighteen Defendants; all are employees of ADOC save three. Defendants filed an Answer on March 2, 1990.

Cello–Whitney conveyed several offers of settlement to the Arizona Attorney General's Office shortly after this action was filed. (See letters dated October 16, 1989, and November 22, 1989, from Florescue to Cello–Whitney attached to Doc. 60.) Specifically, he offered to settle this case and his other Arizona cases in exchange for his transfer back to Washington. As of November of 1989, Defendants were unwilling to agree to these terms.

On February 23, 1990, Cello–Whitney sent a letter to Douglas W. Carr (Carr), an Assistant Attorney General for the State of Washington. (Exhibit B to Doc. 92.) Cello–Whitney urged an immediate response to his proposal to settle all his cases in exchange for a transfer back to Washington.[6] He also indicated that Carr could

**2.** This Court's research reveals that Cello–Whitney has filed no fewer than nineteen (19) cases in this Court. Attachments to Plaintiffs' Amended Complaint in the instant matter indicates that he has filed no fewer than fifty (50) cases in Washington.

**3.** Below are the cases currently pending in this Court in which Cello–Whitney is a Plaintiff. Each is ruled by the terms of the release signed by Cello–Whitney:
   1. *Cello–Whitney v. Lewis,* CIV 88–1317 PHX EHC (MM)
   2. *Cello–Whitney v. Zater,* CIV 88–1537 PHX EHC (MM)
   3. *Cello–Whitney v. Upchurch,* CIV 89–313 PHX EHC (MM)
   4. *Cello–Whitney v. Kirby,* CIV 89–826 PHX EHC (MM)
   5. *Cello–Whitney v. Zell–Terry,* CIV 89–827 PHX EHC (MM)
   6. *Cello–Whitney v. Higgenbothom,* CIV 89–1322 PHX EHC (MM)
   7. *Hisel v. Upchurch,* CIV 89–1666 PHX EHC (MM)
   8. *Cello–Whitney v. Boes,* CIV 89–1674 PHX EHC (MM)
   9. *Cello–Whitney v. Hassenzella,* CIV 89–1965 PHX EHC (MM)
   10. *Cello–Whitney v. Hayes,* CIV 90–129 PHX EHC (MM)
   11. *Shuff, et al v. Upchurch,* CIV 90–131 PHX EHC (MM)
   12. *Cello–Whitney v. Hayes,* CIV 90–275 PHX EHC (MM)
   13. *Cello–Whitney v. Parin,* CIV 90–1039 PHX EHC (MM)
   14. *Cello–Whitney v. Grim,* CIV 90–1261 PHX EHC (MM)
   15. *Cello–Whitney v. Keeney,* CIV 91–391 PHX EHC (MM)
   16. *Cello–Whitney v. Thatcher,* CIV 91–393 PHX EHC (MM)

**4.** The original Complaint was filed October 6, 1989.

**5.** As with many of Plaintiffs' filings in this matter, the Amended Complaint appears to be drafted by Cello–Whitney himself.

**6.** Cello–Whitney states in part:

I am under a great deal of pressure and feel free to state that I have had it. I simply wish to conclude all matters and hopefully be able to return to my rightful place and status. It is not a simply [sic] point of just returning me to

"deal" with Catherine Cruikshank, Cello–Whitney's advisor-counsel in Washington, if he preferred.[7]

Carr contacted Cello–Whitney, on March 5, 1990, by telephone to discuss the proposed settlement. (*Id.;* Exhibits 1 and 3 to Doc. 60; Letter of March 5, 1990 from Cello–Whitney to Upchurch attached to Doc. 135.) The two discussed dismissing the Arizona cases in exchange for Cello–Whitney's transfer to Washington. (*Id.*)

Shortly thereafter, on March 12, 1990, Carr again contacted Cello–Whitney by telephone and conveyed his clients' agreement to the foregoing settlement terms. (Exhibit B to Doc. 92; Exhibit 2 to Doc. 60.) Cello–Whitney wrote Michele Geiger, Assistant Attorney General for the State of Arizona, that same day seeking to expedite the execution of the agreement. He expressed a firm desire to have the matter resolved by March 30, 1990. (*Id.*) Carr contacted Florescue concerning the agreement and she agreed to draft the settlement documents. (Exhibit B to Doc. 92.)

The settlement documents (Exhibit B to Doc. 92) were delivered to SMU on March 15, 1990. After reviewing the documents, Upchurch had them forwarded to Cello–Whitney on March 16, 1990. (Docs. 71, 92, and Cello–Whitney's Affidavit attached to Doc. 175.) Prior to receiving the documents, Cello–Whitney prepared a letter, on March 15, 1990, to Florescue. (Exhibit G to Doc. 92.) He expressed his dissatisfaction with Upchurch reviewing the settlement documents; his demand that Plaintiff Shuff be transferred to Washington in exchange for a release of liability; and his desire to communicate with counsel in Washington concerning the settlement documents. (*Id.*) Cello–Whitney ended the letter stating:

> Washington but I would like to work out every possible aspect and resolve all issues. . . .
> I would hope this communication is not simply placed in a file and disregarded. I would ask that a conference occur within 72 hours of receipt of this letter because we do need to communicate; come to terms and bury all issues. I see no reason why we cannot come

Again I state my distaste and disgust with Upchurch opening and pouring over the agreements before I'd even had a chance to review them. I do not anticipate that matters will be delayed too long, however, there is going to be a delay until matters are made right. Naturally, it was assumed I'd simply sign off and go into this without a second thought but this is not to be the case. I intend to review every word and take my time doing so. If need be I'll bring ADOC to its knees in my time.
(*Id.*)

On March 16, 1990, after reviewing the settlement documents—cover letter and General Release—and discussing several matters with Shuff and Florescue, Cello–Whitney signed the General Release. The release states in part:

> That for and in consideration of the transfer of James Cello–Whitney, Jr., Inmate No. 68512, from the Special Management Unit of the Arizona State Prison Complex at Florence, Arizona, to the custody of the State of Washington, Department of Corrections, within ten (10) days of the execution of this Release, James Cello–Whitney, Jr., his heirs, representatives and assigns, do hereby release and forever discharge the State of Arizona, the Arizona Department of Corrections, and all other departments, agencies, boards and commissions, and all past and present officers, agents and employees thereof, including, but not limited to, all of the State of Arizona defendants named by said James Cello–Whitney, in any case, in any court, and in any appeal therefrom, and all State of Washington defendants named in any case in the United States District Court for the District of Arizona and any appeal therefrom; . . . as well as their past, present and future spouses, in any

to some agreement and take appropriate action WITHOUT DELAY. Thank you and I'll look forward to immediate communication. (*Id.*)

7. Cello–Whitney has appeared *pro se* in each of the cases before this Court. Neither Cruikshank nor any other attorney has entered an appearance on behalf of Cello–Whitney.

and all claims, demands, actions, and causes of action, and all liability whatsoever, in any matter concerning his incarceration, and terms and conditions thereof, or any other matters, while in the physical custody of the Arizona Department of Corrections.

The execution of this instrument by the undersigned releases all claims, demands and causes of action of any kind whatsoever in connection with the above-mentioned incarceration, including all claims, demands and causes of action and consequences of known claims, and even though at present unsuspected, any unknown claims.

(Exhibit B to Doc. 92.)

The next day, Cello–Whitney prepared a letter directed to Lynne W. Abney (Abney), Assistant Attorney General for the State of Arizona. (Exhibit F. to Doc. 92.) He expressed his "intent" to be returned to the State of Washington on or before March 25, 1990; indeed, he affirmed the terms of the release:

As stated I have the stipulations and due to problems at ASPC/Florence–SMU I require to be removed here from pending arrival of Washington officials. As I am unable to bring suit for acts done to me here I see no good reason why I need be subjected to abuse while awaiting transfer. So that my position is made clear should your office, ADOC, WA/DOC or Mr. Carr's office look to renege upon the stipulation in any way I am immediately prepared to lodge a severe legal attack upon ADOC and WA/DOC and cause a major investigation in State and Federal levels.

Now relevant to the above-referenced case I am not responding to any further pleadings since my signature on the stipulations relieves me from any obligation in the case. In any event all motions and so forth will go unanswered except by expressed order of the court. I have nothing further to say on the matter.

(*Id.*)

Cello–Whitney was transferred to the custody of the State of Washington on March 20, 1990. Prior to his transfer, however, he filed a Notice of Intent to Settle and Compromise. (Doc. 55.) The document was signed March 11, 1990, and filed March 19, 1990. In essence, the document advises this Court of a settlement proposal propounded by Cello–Whitney and Shuff.

Surprisingly, on March 20, 1990, Cello–Whitney filed a Notice of Motion advising the Court that he intended to file a motion challenging the release. (Doc. 56.) On March 21, 1990, he filed a "Motion for Order of [sic] Show Cause and Vacating of [sic] Plaintiffs [sic] Signature" and Notice of Filing of Exhibits Regarding Notice of Intent to Settle and Compromise. (Docs. 60 and 58, respectively.) Cello–Whitney alleges the following in his motion:

1. That he was coerced into signing the release;

2. That he was "entitled to a transfer back to Washington despite the release; and

3. That his assent to the release was induced by fraud.

(Doc. 60.) It is noteworthy that the motion was signed on March 16, 1990, the same day he signed the release. Moreover, Cello–Whitney's affidavit, attached to the motion as Exhibit 3, was signed March 8, 1990, eight days *before* he signed the release. His affidavit states, in pertinent part:

4. That it is my opinion, based upon knowledge of the total and complete circumstances, that the State of Washington is utilizing transfer as a means to elude and terminate litigation while taking gross advantage of me. I reasonably believe the Washington Department of corrections is utilizing tactics of coercion and duress and enticement to force a settlement and allow just redress.

5. That in conferring with Mr. Carr I was advised that should I not accept the settlement *on the defendants terms* it would not be unreasonable to expect that I could be transferred to states of harsher and more punitive conditions. Mr. Carr specifically made mention and reference to the States of Alabama and Mississippi.

6. That I am in reasonable fear of my life safety and well being if I do not accept settlement. I reasonably believe if I do accept it shall not be in my best interest and I shall only be afforded my rightful status.

7. My intent in settlement *is not voluntarily* and my signature shall be given *under duress* to gain partial relief I am entitled to simply because I have *no other choice.* I reasonably believe I am being forced into a compromise I would not normally sign and accept. I certify my signature shall not be affixed to any document voluntarily, willingly or in good faith. This document shall serve to void my signature on all and any settlement agreements made with the Washington Attorney General.

(Exhibit 3 to Doc. 60.)

Defendants filed a response to the motion on April 19, 1990. (Doc. 92.) Defendants contend that Cello–Whitney was not coerced into signing the release, and that he signed the agreement willingly; that Cello–Whitney had no right to be transferred to Washington, but rather Defendants retain discretion to transfer him where they choose; and that there was no fraud or misrepresentation inducing Cello–Whitney to sign the release.

Cello–Whitney filed a supplemental memorandum to his motion on May 18, 1990. (Doc. 135.) He alleges further that he was denied the opportunity to have his advisor-counsel in Washington review the settlement documents; that Defendants' counsel misrepresented the effect the release would have on *Cello–Whitney v. Curry,* CIV 88–281T, filed in the United States District Court for the District of Washington in Tacoma; and that Washington and Arizona agreed, prior to and apart from the settlement with Cello–Whitney, to transfer him back to Washington. His "Final and Closing Argument and Statement," filed May 25, 1990, elaborates on his allegation that Defendants were obligated to return him to Washington notwithstanding the release. (Doc. 138.)

On June 22, 1990, this Court conducted a status hearing concerning Cello–Whitney's challenge of the release. This Court ordered that Cello–Whitney file an amended motion setting forth, specifically, the duress, fraud, and misrepresentation that caused him to sign the release. Defendants were ordered to file copies of relevant documents concerning the alleged agreement, apart from the release, between Arizona and Washington to return Cello–Whitney to Washington.

Defendants filed copies of several documents in compliance with this Court's Order on July 8, 1990. (Doc. 162.) Cello–Whitney filed an affidavit and supplemental brief, and concluding memorandum pursuant to the Order. (Docs. 175 and 183, respectively.)

These filings evince WDOC's willingness to consider Cello–Whitney "for return to the state, provided that it is consistent with an overall case management plan ... to include" several conditions:

1. His compliance in taking medication deemed appropriate and necessary by medical/mental health professionals;

2. Cooperation with mental health staff in a treatment program designed for him;

3. Following Arizona's special management rules;

4. Entering into a settlement with Washington Department of Corrections, Arizona Department of Corrections, and other parties involved regarding legal actions taken while in Arizona State. Mr. Whitney should be reasonably stable and in a competent mental state, not experiencing suicidal or homicidal tendencies as exhibited in recent correspondence. We would defer to Arizona Department of corrections psychiatrist, Doctor Lederer, for this assessment. The terms of this condition are to ensure that the agreement entered into by Mr. Whitney and DOC is entered into voluntarily, knowingly, and intelligently;

5. The settlement of legal action will be made with the approval and under the supervision of a federal Judge or Magistrate from the State of Washington to ensure Mr. Whitney's competence to make this agreement and that it is volun-

tarily, knowingly, and intelligently entered into; [and]

6. That Mr. Whitney dismiss with prejudice all pending lawsuits in both federal and state court(s) and releases Washington and Arizona Departments of Corrections and their agents and employees (former and present) from all liability for any and all acts occurring prior to the date of this agreement.

(Exhibit 2 to Doc. 162.) Given compliance with the above conditions and Cello–Whitney's stable behavior for at least 120 days, WDOC would consider him for return to the state. (*Id.*) Cello–Whitney was not eligible to be considered for transfer to Washington before February of 1990. (*Id.;* Exhibit 6 to Doc. 135.)

On October 18, 1989, Cello–Whitney signed the following Behavioral Mental Health Contract, pursuant to the aforementioned conditions:

As a result of a meeting on 09/25/89, the following contract was agreed to:

1. Mr. Whitney shall remain on his medication.

2. Mr. Whitney shall remain disciplinary free for the duration of this contract.

3. Mr. Whitney shall complete the Special Management Unit's Biblioprogram over the next ninety (90) day period from the date of this contract.

4. Mr. Whitney shall take personal responsibility for his behavior rather than blaming others for his interpersonal conflicts and problems.

5. If the conditions above are met throughout the ninety (90) day period of this contract, the unit Deputy Warden, James R. Upchurch, shall write a letter of recommendation to the Washington Department of Corrections on Mr. Whitney's behalf.

(Attachment to Doc. 175.)

On February 9, 1990, believing he had fulfilled the conditions of the Behavioral Mental Health Contract, Cello–Whitney corresponded with several individuals with WDOC and requested a transfer to Washington. (Attachment to Doc. 135.) He did not receive a response.

On March 12, 1990, Upchurch, in light of the litigation costs caused by Cello–Whitney's actions, requested that ADOC make arrangements to return Cello–Whitney to Washington. (Exhibit 1 to Doc. 162.)

## DISCUSSION

■ At the outset, it is necessary to determine what law—state or federal—applies in this case to the issue of release. Generally, the construction and enforcement of settlement agreements, including the determination as to the validity and scope of a release therein, are governed by general contract principles under state law. *Coleson v. Inspector General of Dept. of Defense,* 721 F.Supp. 763, 766 (E.D.Va. 1989). However, this is not always the case:

Settlements and releases assertedly entered into in respect of federal litigation already in progress implicate federal procedural interests distinct from the underlying substantive interests of the parties. Once a claim—whatever its jurisdictional basis—is initiated in the federal courts, we believe that the standards by which that litigation may be settled, and hence resolved short of adjudication on the merits, are preeminently a matter for resolution by federal common law principles, independently derived.

*Gamewell Mfg. v. HVAC Supply,* 715 F.2d 112, 115 (4th Cir.1983). Thus, "conditions affecting the validity of a release of significant federal rights are eminently a matter of federal law." *Jones v. Taber,* 648 F.2d 1201, 1203 (9th Cir.1981). More specifically, federal common law controls the effect and interpretation of such a release or agreement. *See Town of Newton v. Rumery,* 480 U.S. 386, 392, 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405 (1987); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1481 (6th Cir. 1989) ("federal law controls the validity of a release of a federal cause of action"); *Fulgence v. McDermott & Co.,* 662 F.2d 1207, 1209 (5th Cir.1981) ("creation of a federal rule ... is appropriate where, as here, the rights of the litigants and the operative federal policies derive from a federal source"); *Griswold v. E.F. Hutton & Co., Inc.,* 622 F.Supp. 1397, 1404 (D.D.Ill.

1985).[8] For example, the release of admiralty and maritime claims is governed by federal common law. *See Garrett v. Moore–McCormick Co.*, 317 U.S. 239, 243–48, 63 S.Ct. 246, 249–52, 87 L.Ed. 239 (1942); *Borne v. A & P Boat Rentals No. 4, Inc.*, 780 F.2d 1254, 1256 (5th Cir.1986). The release of federal statutory causes of action are also controlled by federal law. *See Maynard v. Durham & Southern Railway Co.*, 365 U.S. 160, 161, 81 S.Ct. 561, 562, 5 L.Ed.2d 486 (1961) (Federal Employers' Liability Act); *Dice v. Akron, Canton & Youngstown Railroad Co.*, 342 U.S. 359, 361–62, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952) (Federal Employers' Liability Act); *O'Hare v. Global Natural Resources, Inc.*, 898 F.2d 1015, 1017 (5th Cir. 1990) ("[t]he better rule is to fashion a federal common law to determine this issue[—whether a release of a claim under the Age Discrimination in Employment Act is voluntary—] because the policies embedded in the federal statute should not be frustrated by state law"); *Parker v. DeKalb Chrysler Plymouth*, 673 F.2d 1178, 1180 (11th Cir.1982) (release of claims arising under the Truth in Lending Act, 15 U.S.C. § 1601 et seq.); *Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir.1977) (federal securities law); *Bergstrom v. Sears, Roebuck and Co.*, 532 F.Supp. 923, 932 (D. Minn.1982) (patent infringement); *Theatre Time Clock Co. v. Motion Picture Advertising Corp.*, 323 F.Supp. 172, 175 (E.D.La. 1971) (antitrust).

■ In particular, release of a civil rights claim has been held to be controlled by federal common law. Such is the rule regarding a release of claims arising under 42 U.S.C. § 1983, as in the case at hand. *Jones*, 648 F.2d at 1203; *Boyd v. Adams*, 513 F.2d 83, 87 (7th Cir.1975).

This Court therefore believes it proper to apply an independently derived federal standard to govern resolution of the settlement issues raised in this case.

In choosing such independent federal rules "federal courts are free to apply the traditional common law techniques of decision and to draw upon all the sources of common law in cases such as the present." *D'Oench Duhme & Co. v. F.D.I.C.*, 315 U.S. 447, 469, 62 S.Ct. 676, 685, 86 L.Ed. 956 (1942) (Jackson, J., concurring). However, each rule selected must be "appropriate to effectuate the policy of the governing Act." *Id.*

■ Historically, federal courts have applied general principles of contract in determining the validity of a release of rights under federal statutes dealing with the employer-employee relationship. *See DiMartino*, 636 F.Supp. at 1249. This is similarly the case with actions involving admiralty and maritime claims. *See Gen. Intermodal Logistics v. Mainstream Ship. & S.*, 748 F.2d 1071, 1075 (5th Cir.1984). Nothing in the federal civil rights statutes suggests that these same common law principles are not applicable here as well. *Cf. Jones*, 648 F.2d at 1203. Though the federal common law of release is largely undeveloped, adequate and instructive guidance may be had from cases interpreting maritime releases, *Id.*, and from the Restatement of Contracts 2d, *Street*, 886 F.2d at 1481; *Gamewell Mfg.*, 715 F.2d at 116.

■ Settlement agreements have always been a favored means of resolving disputes, thus they will be entered whenever possible. *Williams v. First National Bank*, 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910); *McCall–Bey v. Franzen*, 777 F.2d 1178, 1195 (7th Cir.1985); *In re Springpark Assoc.*, 623 F.2d 1377, 1380 (9th Cir.) (quoting *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir.1978)), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980). When fairly arrived at and properly entered into, settlement agreements and releases are "generally viewed as binding, final, and as conclusive of the rights of the parties as is a judgment entered by a court." *Thibaut v. Ourso*, 605 F.Supp. 1, 3 (M.D.La.1981). An agree-

---

8. For a complete discussion of this issue see *Morgan v. South Bend Community School Corp.*, 797 F.2d 471, 473–79 (7th Cir.1986); *Gamewell* *Mfg.*, 715 F.2d at 115–16; *DiMartino v. City of Hartford*, 636 F.Supp. 1241, 1248–49 (D.Conn. 1986).

ment to settle a legal dispute is a contract governed by the principles of contract law. *Miller v. Fairchild Indus.*, 797 F.2d 727, 733 (9th Cir.1986), *cert. denied*, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990). "Each party agrees to 'extinguish those legal rights it sought to enforce through litigation in exchange for those rights secured by the contract.'" *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir.1989) (quoting *Village of Kaktovik v. Watt*, 689 F.2d 222, 230 (D.C.Cir.1982)). "[A] release is not a device to exempt from liability but is a means of compromising a claimed liability and to that extent recognizing its possibility." *Callen v. Pennsylvania R. Co.*, 332 U.S. 625, 630–31, 68 S.Ct. 296, 298, 92 L.Ed. 242 (1948). One attacking a release or settlement "must bear the burden of showing that the contract he [or she] made is tainted with invalidity." 332 U.S. at 630, 68 S.Ct. at 298; *Coleson*, 721 F.Supp. at 768. *But see Judie v. Hamilton*, 872 F.2d 919, 924 (9th Cir.1989) (the party relying on the release has the burden of establishing the validity of the release). A party to a settlement cannot avoid the agreement "merely because he [or she] subsequently believes the settlement is insufficient." *Taylor v. Gordan Flesch Co., Inc.*, 793 F.2d 858, 863 (7th Cir.1986).

■ A release of claims under § 1983 is valid only if it results from a decision that is "voluntary, deliberate, and informed." *Jones*, 648 F.2d at 1203. There are both subjective and objective aspects to each of these elements. *Id.* Failing to find cases analyzing the criteria of validity for a § 1983 release, the Ninth Circuit, in *Jones*, sought guidance from decisions interpreting maritime releases:

> The special significance of maritime release cases is that a release's validity must be predicated on an unusually strong showing that the nature and extent of the seaman's injuries and the shipowner's potential liability for them was explained clearly to the seaman in circumstances where his signing of the release was quite free and intelligent. In maritime cases, a seaman's release of claims for injuries cannot be relied on by a shipowner otherwise liable for the inju-

ry unless the shipowner can affirmatively demonstrate that the claimant understood the nature of whatever statutory and common-law remedies he waived by the release. The federal solicitude for claimants under section 1983 is at least as great as that for seamen and in both situations the claimant's dependence on potential defendants requires the release to be examined with particular care. Because the indicia of reliability required of section 1983 releases must be no less unambiguous than those required of maritime releases, we hold that defendants relying on section 1983 releases signed by prisoners must meet the same standard of validity applicable to maritime releases.

648 F.2d at 1203–04. (Citations omitted.)

■ Whether a release of a § 1983 claim is valid, in essence, is a question to be determined from all the circumstances. *Salmeron v. United States*, 724 F.2d 1357, 1362 (9th Cir.1983) (citing *Jones*, 648 F.2d at 1203). This criteria calls into question the authority upon which a court may resolve disputes relating to settlement agreements and releases.

■ It is well settled that a district court has the equitable power to enforce summarily a settlement agreement in a case pending before it. *Callie v. Near*, 829 F.2d 888, 890 (9th Cir.1987); *Gatz v. Southwest Bank of Omaha*, 836 F.2d 1089, 1095 (8th Cir.1988); *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976). Where, however, material facts concerning the existence or terms of an agreement to settle or release are in dispute, the parties must be allowed an evidentiary hearing. *Petty v. Timken Corp.*, 849 F.2d 130, 132 (4th Cir.1988); *Callie*, 829 F.2d at 890; *Russell v. Puget Sound Tug & Barge Co.*, 737 F.2d 1510, 1511 (9th Cir.1984). Within the purview of this rule, Cello–Whitney seeks an evidentiary hearing.

The issue presented squarely to this Court—whether there was any disputed issue of material fact as to the validity of the

release—is similar to that which any court must address when ruling on a motion for summary judgment.[9] *Cf. Millner v. Norfolk & W.R. Co.,* 643 F.2d 1005, 1009 (4th Cir.1981).

The Third Circuit observed, in *Tiernan v. Devoe,* 923 F.2d 1024, 1031 (3rd Cir.1991), that:

> This is not mere coincidence. The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same—both deprive a party of his right to be heard in the litigation.

A motion for summary judgment must be granted if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Accordingly, the movant must adumbrate "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both "material," in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), and "genuine," in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indu. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

■ Thus, a court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence. 477 U.S. at 255–56, 106 S.Ct. at 2514.

A careful review of Cello–Whitney's motion challenging the release, supporting affidavits, and supplemental memoranda reveals the following allegations supporting his contention that the release is ineffective:

1. That ADOC was obligated to transfer him back to Washington prior to the agreement being consummated;

2. That he was mentally unstable at the time he signed the release;

3. That he was not allowed telephonic communication with Catherine Cruikshank, his attorney-advisor in Washington, prior to signing the release;

**9.** "Summary judgment, of course, is the widely applauded device which seeks to obviate the delay and expense incident to the enforcement of valid claims where denials are interposed which, even if sufficient in law on their face, are actually sham, and in reality raise no genuine triable issue of fact. It was designed to discern between real issues desiring trial and feigned issues which merely delay the entry of judgment." *Weather–Rite Sportswear Co. v. United States,* 298 F.Supp. 508, 510–11 (C.Ct. 1969).

4. That the effect the release would have on case *Cello–Whitney v. Curry,* CV 88–281T, filed in Washington, was misrepresented; and

5. That he was told he could expect to be transferred to another state, such as Alabama or Mississippi, if he did not sign the release.

Against the firmly-entrenched backdrop of criteria set forth above, this Court concludes that Cello–Whitney fails to sustain his burden of establishing the existence of genuine, material issues of fact with respect to any of his claims.

### A. *Claim 1*

Cello–Whitney first claims that ADOC was contractually obligated to return him to Washington, notwithstanding the settlement agreement; in other words, he contends the release is void for lack of consideration.

In order that there may be consideration in exchange for the release of a legal claim, "there must be mutual concessions." *Maynard,* 365 U.S. at 163, 81 S.Ct. at 563 (quoting *Burns v. Northern Pacific Railway Co.,* 134 F.2d 766, 770 (8th Cir.1943)). § 71 of the Restatement, Second, Contracts, sets forth some important parameters when considering whether there is consideration:

1. To constitute consideration, a performance or a return promise must be bargained for.

2. A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.

3. The performance may consist of

   a. an act other than a promise, or

   b. a forbearance, or

   c. the creation, modification or destruction of a legal relation.

4. The performance or return promise may be given to the promisor or to some other person. It may be given by the promisee or by some other person.

■ A well-established principle of consideration is that "giving a party something to which he or she has an absolute right is not consideration to support that party's contractual promise." *Salmeron,* 724 F.2d at 1362. Stated in slightly different terms, a promise to perform a pre-existing duty is insufficient consideration. Restatement, Second, Contracts § 73.[10]

■ Cello–Whitney charges that ADOC had a pre-existing duty to return him to the custody of WDOC, thus there is no consideration for the release and it should be set aside. As set out in the facts above, WDOC expressed its willingness to consider Cello–Whitney for return to Washington, provided a number of conditions were met. (Exhibit 2 to Doc. 162.) Several of the conditions relate to all the parties, including Cello–Whitney, entering into a settlement whereby all of Cello–Whitney's cases, arising out of his custody in Arizona, be dismissed with prejudice. The release Cello–Whitney now challenges is a condition precedent to Washington's obligation to consider him for return to the state.[11] Therefore, there was no pre-existing duty on the part of WDOC or ADOC to return him to Washington. *Cf. McBride,* 571 F.Supp. at 607. Cello–Whitney received a transfer to Washington in exchange for release of his cases. The release is not void for lack of consideration.

### B. *Claim 2*

Cello–Whitney next alleges that he was mentally unstable as a result of his bipolar disorder at the time he signed the release, therefore the release is void.

---

**10.** § 73 states:

Performance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration; but a similar performance is consideration if it differs from what was required by the duty in a way which reflects more than a pretense of bargain.

**11.** A condition precedent is discussed in Restatement, Second, Contracts § 224:

A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.

■ Capacity to understand one's rights and the consequences of agreeing to settle is a factor to consider in rejecting a release. *Borne*, 780 F.2d at 1257. Restatement, Second, Contract § 11(2), says that a natural person has capacity to incur contractual duties, unless he or she is "mentally ill or defective." Comment (c) to this section states:

> In order to incur a contractual duty, a party must make a promise, manifesting his intention; in most cases he must manifest assent to a bargain. The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct. Hence if physical disability prevents a person from acting, or if mental disability is so extreme that he cannot form the necessary intent, there is no contract. Similarly, even if he intends to engage in the conduct, there is no contract if the other party knows or has reason to know that he does not intend the resulting appearance of assent. In such cases it is proper to say that incapacity prevents the formation of a contract.

■ Although the record supports Cello–Whitney's claim that he has a mental disorder, the disorder is controlled with medication. Cello–Whitney himself confirms, in a letter to WDOC, that he fully complied with the terms of the Behavioral Mental Health Contract: two of the terms require that he take his medication as prescribed and cooperate with the mental health staff. (Attachment to Doc. 135.)

The record convinces this Court that there is no genuine, material issue of fact concerning Cello–Whitney's capacity to sign the release. His intent to enter the agreement is manifest from his conduct: he proposed the agreement; he negotiated its terms himself; he informed ADOC that he intended to "review every word" of the agreement and take his time doing so (Exhibit G to Doc. 92); and he threatened to sue ADOC and WDOC if they reneged on the agreement (Exhibit F to Doc. 92).

Finally, there is no evidence that either ADOC or WDOC knew or should have known that Cello–Whitney did not intend the resulting appearance of assent. Certainly they knew of his mental disorder and were concerned that his assent be voluntary, knowing, and intelligent. (*See* Attachments to Doc. 175.) Their concerns, however, were alleviated by Cello–Whitney's continual, committed desire to execute the agreement.

Cello–Whitney has a mental disorder but he is by no means mentally incapacitated. Even taking into account his instant motion contending the release is void—signed the day the release was signed—and his attached affidavit—signed eight days *before* the release was signed—he refrained from filing these documents until March 21, 1990, *after* the release was signed. This Court has no doubt that Cello–Whitney intended to induce Defendants into a settlement, execute the release, and *then* seek to have the release set aside.[12] In light of the undisputed facts, this Court cannot justify imputing the knowledge of Cello–Whitney's manipulations and calculations on Defendants. If this Court were to accept the proposition that the mere assertion of an issue which generally is the province of the jury should foreclose courts from summary relief, the courts' equitable power would be rendered a nullity. *Cf. First Sec. Sav. v. Kansas Bankers Sur. Co.*, 849 F.2d 345, 350 (8th Cir.1988).

### C.  *Claim 3*

As his third challenge of the release, Cello–Whitney alleges that ADOC refused to provide him telephonic communications with his attorney-advisor, Cruikshank, in Washington, prior to his execution of the release.

■ Access to or consultation with an attorney prior to releasing a federal claim is a factor to consider when determining whether a release is valid. *See O'Hare*, 898 F.2d at 1017.

---

**12.** There is evidence, however, that Cello–Whitney attempted to inform Florescue of his motion on March 18, 1990, not that this fact bears any significance. (Attachment to Doc. 175.)

The undisputed facts reflect that Cello–Whitney asked to call Cruikshank several times in the two or three weeks prior to the time he signed the release. However, neither Cruikshank nor any other attorney has ever entered an appearance in any of Cello–Whitney's actions before this Court. Cruikshank confirms this fact in her April 20, 1990, letter to Carr, in which she states:

> Should you agree to re-open negotiation, I will represent Mr. Cello–Whitney. As to all other *pending* litigation in federal and state courts, I do not represent Mr. Cello–Whitney and he acts pro se.

(Exhibit 2 to Doc. 135.) This letter further confirms that Cruikshank does not presently represent Cello–Whitney. He has not moved this Court for appointment of counsel, nor is he entitled to counsel as a matter of law. Cello–Whitney also fails to explain why he could not have contacted Cruikshank by mail, as he would with anyone else.

Finally, what significance lack of consultation with counsel had in this matter is negligible. Cello–Whitney himself proposed the general terms of the release. It simply required him to release all Defendants from claims arising out of his incarceration in Arizona in exchange for his transfer to Washington. Cello–Whitney again fails to raise a genuine, material issue of fact.

### D. *Claim 4*

Cello–Whitney next contends that Florescue misrepresented the effect the release would have on case *Cello–Whitney v. Curry*, CV 88–281T, filed in the United States District Court for the District of Washington. He alleges that Florescue advised him, on March 16, 1990, that the release would call for dismissal of Arizona defendants only from the case. Cello–Whitney contends that the Washington defendants are *not* to be dismissed out of the case.

To establish fraud, a party must show, by clear and convincing evidence, the following elements:

1. A representation;
2. Its falsity;
3. Its materiality;
4. The speaker's knowledge of its falsity or ignorance of its truth;
5. His intent that it should be acted on by the person and in the manner reasonably contemplated;
6. The hearer's ignorance of its falsity;
7. His reliance on its truth; and
8. His right to rely thereon.

*McCarthy v. Cahill*, 249 F.Supp. 194, 196 (D.C.D.C.1966). *See McBride*, 571 F.Supp. at 608–09.

Cello–Whitney claims that the Dismissal by Stipulation he signed to be filed in CV 88–281T calls for the dismissal of the action, contrary to his intent that only claims relating to his incarceration in Arizona be dismissed. (Attachment to Doc. 175.) The stipulation states:

> Plaintiff Pro Se and Defendants, pursuant to Rule 41(a)(1), Federal Rules of Civil Procedure, hereby stipulate to dismissal of the above-captioned complaint and action with prejudice under the terms as set forth in the Release attached as Exhibit "A."

The release referred to as "Exhibit 'A' " is the General Release signed by Cello–Whitney. The release, as set forth above, releases claims against all parties arising out of his incarceration in Arizona. In fact, CV 88–281T is specifically listed in the release as one of the cases that would be affected.

Whether CV 88–281T should be dismissed in whole or in part is a question beyond the jurisdiction of this Court. CV 88–281T should be dismissed pursuant to the terms of the release as the stipulation states. If Cello–Whitney has a complaint about how the release affects CV 88–281T, he should present it to the district court in Washington.[13]

Florescue's representation that Washington defendants would not be dismissed out of CV 88–281T may or may not be false. Cello–Whitney has failed to produce any evidence either way. Thus, he has failed his burden.

---

**13.** The record currently before this Court does not explain the status of CV 88–281T.

Assuming Florescue's representation was false, Cello–Whitney still fails his burden. He fails to show, *inter alia*, that he reasonably relied on the representation. Cello–Whitney proposed the general terms of the release and he had an opportunity to "review every word" of it. (*See* Exhibit 6 to Doc. 92; Affidavit attached to Doc. 175.) Cello–Whitney, of all people, should know whether a defendant he has sued bears alleged liability for circumstances arising out of his incarceration in ·Arizona. Again, if Cello–Whitney wishes to challenge the effect the release and stipulation have had or will have on CV 88–281T, he should argue his position to the district court handling that case.

### E. *Claim 5*

Cello–Whitney's last claim challenges the release on the ground that Carr and Florescue told him "it would not be unreasonable [for him] to expect to be transferred" to another state, such as Alabama or Mississippi, if he did not sign the release; that is, Cello–Whitney alleges, he was coerced into signing the release and therefore his assent was involuntary. (Exhibit 3 to Doc. 60; Doc. 175.)

■ As stated previously, a release is valid only if it results from a decision that is "voluntary, deliberate, and informed." *Jones*, 648 F.2d at 1203. The existence of duress or coercion, of course, rebuts a finding that a release is valid.

Courts generally look to three basic elements in determining whether an aggrieved party, in agreeing to a compromise of earlier contractual rights or of release of a legal claim, is entitled to avoid the otherwise binding effect of his or her settlement due to duress or coercion. They are: (1) a wrongful act which (2) overcomes the will of a person who (3) has no adequate legal remedy to protect his or her interests. 25 Am.Jr.2d, *Duress and Undue Influence*, § 7. *See United States v. McBride*, 571 F.Supp. 596, 612 (S.D.Tex.1983), *aff'd*, 915 F.2d 1569 (1990); *Schmitt–Norton Ford, Inc. v. Ford Motor Co.*, 524 F.Supp. 1099, 1104 (D.Minn.1981), *aff'd*, 685 F.2d 438

(1982); *In re Frenz Enterprises, Ltd.*, 89 B.R. 220, 226 (Bankr.M.D.Fla.1988); *In re Ashby Enterprises, Ltd.*, 47 B.R. 394, 398 (Bankr.D.C.1985). Cello–Whitney fails to establish the first and second elements.[14]

Cello–Whitney charges that the "wrongful act" was the threat of being transferred to somewhere other than the State of Washington if he did not sign the release. A threat which may be sufficient to make a contract voidable exists only "[i]f a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative...." Restatement, Second, Contracts § 175 (1981). The Restatement specifies in § 176 when, under this rule, a threat may be deemed improper. These are:

> a. [W]hat is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property;
>
> b. [W]hat is threatened is a criminal prosecution;
>
> c. [W]hat is threatened is the use of civil process and the threat is made in bad faith; or
>
> d. [T]he threat is a breach of the duty of good faith and fair dealing under a contract with the recipient.

Yet, "[hard] bargaining between experienced adversaries of relatively equal power ought not to be discouraged." Restatement, Second, Contracts § 176, Comment f.

Specification (d) is the only conceivable instance under § 176 that is applicable to this case; indeed, Cello–Whitney claims specifically that those he negotiated the release with did not deal in good faith or fairly. (Doc. 60.)

The facts in *Goldstein v. S & A Restaurant Corp.*, 622 F.Supp. 139, 144–45 (D.C.D.C.1985), are analogous. In *Goldstein*, the plaintiff maintained that the defendant took advantage of plaintiff's financial straits in order to wrest a hard bargain. At all relevant times, the arrangement between the parties operated as follows. Defendant purchased raw meat, which it stored in warehouses located in

---

**14.** This Court, therefore, need not address the third element.

Nebraska and Colorado. Plaintiff would draw from this inventory, ship the meat to its Maryland warehouse, and after processing the meat, distribute it to designated restaurants owned by defendant. Within seven days of receiving the meat at its warehouse, plaintiff was to pay defendant for the raw meat, receiving payment later for the processed meat that it delivered to the individual restaurants. .

When plaintiff fell into financial straits, defendant filed suit to collect past due payments. In return for defendant's voluntary dismissal of the suit, plaintiff executed an agreement modifying their earlier arrangement. Plaintiff acknowledged the debt owed and agreed that the relationship could be terminated upon ten days' notice. Shortly thereafter, defendant terminated the relationship. Plaintiff filed an action seeking relief for what it believed was a wrongful termination of its contractual relationship with defendant.

The court found no evidence that plaintiff was a victim of duress. It explained:

> Financial pressures, even in the context of unequal bargaining power, do not constitute economic duress. If the means used are themselves lawful—and no one argues that [defendant] is guilty of any illegality—proof of "business compulsion" requires "a showing that the victim's financial straits were caused by the other party." *National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 644 (S.D.N.Y.1978), *aff'd*, 597 F.2d 314 (2d Cir.1979) (emphasis added). The most that can be said here is that [defendant] may have threatened to terminate [plaintiff] if the requisite documents were not signed. But since any contract existing between the parties was terminable at will, [defendant], if it indeed made such a threat, did no more than threaten to exercise its rights under the existing contract. Such a threat does not amount to duress.

*Goldstein*, 622 F.Supp. at 145. (Citations omitted.)

■ Taking Cello–Whitney's allegation—that Carr and Florescue threatened he might be transferred to some state oth-

er than Washington if he did not sign the release—as true, Carr and Florescue did no more than threaten the exercise of ADOC's and WDOC's prerogative to transfer him wherever for whatever reasons. *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983); *Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976). Such a threat does not amount to duress.

The second element of duress requires a determination of whether assent to the agreement or release was voluntary. The Supreme Court, in *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 249, 93 S.Ct. 2041, 2047, 2059, 36 L.Ed.2d 854 (1973), observed that the most extensive judicial exposition of the meaning of "voluntariness" has been developed in those cases in which the Court has had to determine the "voluntariness" of a defendant's confession for purposes of the Fourteenth Amendment. 412 U.S. at 223, 93 S.Ct. at 2045–46. The Court recognized that there is no "talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." 412 U.S. at 224, 93 S.Ct. at 2046. The Court stated, upon further reflection, that:

> It cannot be taken literally to mean a "knowing" choice. "Except where a person is unconscious or drugged or otherwise lacks capacity for conscious choice, all incriminating statements—even those made under brutal treatment—are 'voluntary' in the sense of representing a choice of alternatives. On the other hand, if 'voluntariness' incorporates notions of 'but-for' cause, the question should be whether the statement would have been made even absent inquiry or other official action. Under such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind." It is thus evident that neither linguistics nor epistemology will provide a ready definition of the meaning of "voluntariness."

Rather, "voluntariness" has reflected an accommodation of the complex of values implicated in police questioning of a sus-

pect. At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws ... At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice.

412 U.S. at 224–25, 93 S.Ct. at 2046. (Footnotes and citations omitted.) It concluded that the question whether a consent to a search was in fact "voluntary" must be determined from the "totality of all the circumstances." 412 U.S. at 227, 93 S.Ct. at 2048.

Similarly, assessing the "voluntariness" of Cello–Whitney's release requires a review of all the circumstances. *Salmeron,* 724 F.2d at 1362. *See Jones,* 648 F.2d at 1203; *cf. O'Hare,* 898 F.2d at 1017 (adopting a similar test to review a release of a claim pursuant to the Age Discrimination in Employment Act); *Stroman v. West Coast Grocery Co.,* 884 F.2d 458, 462 (9th Cir.1989) (establishing a similar test in a Title VII case), *cert. denied,* — U.S. —, 111 S.Ct. 151, 112 L.Ed.2d 117 (1990).

Among those factors generally found relevant to the inquiry of voluntariness are:
1. The plaintiff's education and business experience;
2. The amount of time the plaintiff had possession of or access to the agreement before signing it;
3. The role of plaintiff in deciding the terms of the agreement;
4. The clarity of the agreement; and
5. Whether the plaintiff was represented by or consulted with an attorney.

*See O'Hare,* 898 F.2d at 1017; *Riley American Family Mut. Ins. Co.,* 881 F.2d 368, 372 (7th Cir.1989); *Bormann v. AT & T Communications, Inc.,* 875 F.2d 399, 403 (2d Cir.), *cert. denied,* 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989); *Runyan v. Nat'l Cash Register Corp.,* 787 F.2d 1039, 1041, 1043 (6th Cir.) (en banc), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986); *Coventry v. U.S. Steel Corp.,* 856 F.2d 514, 523 (3rd Cir.1988). The Ninth Circuit, in *Jones,* considered several other factors relevant to § 1983 waivers: (1) the plaintiff's state of mind, (2) whether the atmosphere for the execution of the release is noncoercive, and (3) how significant is the absence of a coercive atmosphere. 648 F.2d at 1204.

Cello–Whitney has had a vast amount of experience with litigation; his own records reflect that he has filed no less than sixty-five (65) actions relating to his custody and confinement, and no less than fifteen (15) appeals. This Court is not aware of him ever requesting the appointment of counsel in any of his Arizona cases. Indeed, Cello–Whitney prides himself for his ability to handle his cases on his own as well as to take the lead in those cases with multiple plaintiffs, such as the instant action. (*See* Exhibit A to Doc. 92 in which Cello–Whitney states in a letter to Thomas P. Prose, Assistant Attorney General for Arizona, "I am somewhat curious as to where you come up with the notion I intend to file actions just to be doing it. Certainly, within the scope of 43 pending actions I can handle any situation which may arise. I do not need additional litigation, however, I do not intend to be hindered by your frivolousness [sic] in the event future action may need to issue"; Exhibit G to Doc. 92, in which Cello–Whitney states in a letter to Florescue concerning the settlement agreement, "I intend to review every word and take my time doing so.") Cello–Whitney is articulate and there is little doubt that his litigiousness in Arizona brought him the relief he has sought—return to Washington.

With respect to the release itself, it is unambiguous; it states merely that Cello–Whitney releases all those he claims are liable for conduct arising out of his confinement in Arizona in exchange for his transfer to Washington. It is undisputed that Cello–Whitney first proposed these terms. He communicated the terms to Defendants, who ultimately accepted them. Thus, Cello–Whitney himself is largely responsible for the terms of the release.

Focusing on the events surrounding Cello–Whitney's assent to the release turns attention to the remaining factors relevant to this Court's inquiry: (1) what was the atmosphere for the execution of the release, and (2) what was his state of mind.

As stated in the facts above, the settlement documents were delivered to SMU on March 15, 1990. Cello–Whitney was taken from his cell on March 16, 1990, to CPO II Coppola's office to review and sign the release and stipulations for dismissal. (Affidavit attached to Doc. 175.) Lt. Laugen was also present. (*Id.*) Cello–Whitney requested to review the documents in his cell. (*Id.*) Lt. Laugen informed him that Florescue instructed the officers not to let him take the documents back to his cell. (*Id.*) Cello–Whitney returned to his cell. (*Id.*) Soon thereafter, the documents were delivered to him. (*Id.*) Cello–Whitney "indicated he did not want the documents and wanted to call Ms. Cruikshank, Ms. Florescue and Mr. Carr." (*Id.*) The documents were left in his cell by the officer. (*Id.*) Cello–Whitney reviewed the documents for approximately ten minutes. (*Id.*) He was then allowed to leave his cell and consult with Co-Plaintiff Shuff. They "decided to invoke the March 8th affidavit and signed under duress. After signing the documents then [sic] being advised of misrepresentation [P]laintiff Shuff and [Cello–Whitney] drafted the original motions to vacate[,] had them copied and placed them in the mail." (*Id.*) Apparently Cello–Whitney conversed with Florescue after his initial consultation with Shuff. It is at this point that Florescue told him if he did not sign the agreement he could expect to be transferred to a state other than Washington. (*Id.*) Cello–Whitney states that Carr told him the same thing on March 15, 1990.

These facts reflect that Cello–Whitney took advantage of opportunities to review the settlement documents by himself, with Shuff, and to discuss the terms with Florescue. The prison environment fairly accommodated a largely noncoercive atmosphere.

Moreover, the facts, as alleged by Cello–Whitney, leave little doubt as to his state of mind. This Court is convinced that he intended to enter the settlement under the terms of the release as it currently stands, notwithstanding the "threat" of transfer to a state other than Washington. Certainly he received consideration for the release—his transfer back to Washington. However, the timing of the drafting of the instant motion—the day he signed the release—and the attached affidavit—eight days prior to signing the release—suggest his lack of good faith and fair dealing.

Nevertheless, ADOC and WDOC did nothing wrong in informing Cello–Whitney he could be transferred to a state other than Washington. They have the authority to transfer prisoners wherever for whatever reason. Accordingly, since the threatened action was not "wrongful," there was no coercion sufficient to obviate the voluntariness of Cello–Whitney's signature. *Trans–Sterling, Inc. v. Bible*, 804 F.2d 525, 529 (9th Cir.1986). This Court finds that Cello–Whitney fails to establish a genuine, material issue of fact with respect to any of his claims, thus no purpose would be served to conduct an evidentiary hearing. He cannot avoid the release simply because he now believes it is insufficient. *Taylor*, 793 F.2d at 863.

■ Finally, even if this Court were to find some ground making the release voidable, Cello–Whitney's behavior following his signing amounts to a ratification of the agreement:

> Ratification may be manifested in one or more of several ways: a party may ratify, first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and third, by recognizing its validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it.

*Gallon v. Lloyd–Thomas Company*, 264 F.2d 821, 826 (8th Cir.1959). Cello–Whitney's letter to Abney the day after he signed the release, as quoted above, expresses his intent to bind ADOC and WDOC to the agreement, and acknowledges that the impending dismissal of his

cases, as a result of the release, relieves him of any obligation to continue to prosecute the cases. (Exhibit F to Doc. 92.) That it was his intent to affirm the agreement is evident from the language in his letter.

IT IS THEREFORE ORDERED:

1. That Cello–Whitney's motion to vacate is denied. (Doc. 60.)

2. That Defendants file a copy of the General Release within ten (10) days of the date this Order is filed.

3. That this action be dismissed with prejudice under Rule 41(a)(1), Federal Rules of Civil Procedure, pursuant to the terms of the General Release.